## THE TAP LINE CASES.[1]

### APPEALS FROM THE UNITED STATES COMMERCE COURT.

Nos. 829, 830, 831, 832, 833, 834, 835, 836.   Argued April 8, 9, 13, 1914.—
Decided May 25, 1914.

An order of the Interstate Commerce Commission, based on its finding
that the service rendered by a connecting line is not a service of
transportation by a common carrier railroad, but a plant service by
a plant facility, to the effect that allowances and divisions of rates

———

[1] Docket titles of the Tap Line Cases are: No. 829. United States and
Interstate Commerce Commission v. Louisiana & Pacific Railway Co.;
No. 830. Atchison, Topeka & Santa Fe Railway Co. v. Louisiana &
Pacific Railway Co.; No. 831. United States and Interstate Commerce
Commission v. Woodworth & Louisiana Central Railway Co.; No. 832.
Atchison, Topeka & Santa Fe Railway Co. v. Woodworth & Louisiana
Central Railway Co.; No. 833. United States and Interstate Commerce
Commission v. Mansfield Railway & Transportation Co.; No. 834.
Atchison, Topeka and Santa Fe Railway Co. v. Mansfield Railway &
Transportation Co.; No. 835. United States and Interstate Commerce
Commission v. Victoria, Fisher & Western Railroad Co.; No. 836.
Atchison, Topeka & Santa Fe Railway Co. v. Victoria, Fisher & Western Railroad Co.

are unlawful and must be discontinued, is affirmative in its nature and subject to judicial review by the Commerce Court.

Where the validity of an order of the Interstate Commerce Commission directing discontinuance of divisions of rates with another railroad depends upon whether the latter is a common carrier or a plant facility, the determination of that question upon undisputed facts is a conclusion of law which is subject to judicial review.

Although a railroad may have originally been a mere plant facility, after it has been acquired by a common carrier duly organized under the law of the State and performing service as such and regulated and operated under competent authority, it is no longer a plant facility but a public institution, even though the owner of the industry of which it formerly was an appendage is the principal shipper of freight thereover.

The extent to which a railroad is in fact used does not determine whether it is or is not a common carrier, but the right of the public to demand service of it.

Railroads owned by corporations properly organized under the laws of the State in which they are and treated as common carriers by the State, authorized to exercise eminent domain, dealt with as common carriers by other railroad corporations, and engaged in carrying for hire goods of those who see fit to employ them, are common carriers for all purposes, and cannot be treated as such as to the general public and not as to those who have a proprietary interest in the corporations owning them.

Congress has expressly excepted the transportation of lumber from the operation of the commodities clause, and had power so to do. *United States* v. *Del. & Hudson Co.*, 213 U. S. 366.

Debates in Congress may be resorted to for the purpose of showing that which prompted the legislation.

This court will not, in interpreting the power of the Interstate Commerce Commission in regard to a particular traffic, ignore a declaration of public policy in regard to that traffic as shown by an enactment of Congress.

Congress, by the exemption of lumber from the operation of the commodities clause, shows that it regarded railroad tap lines for lumber, owned and operated by the owners of the timber, as essential for the development of the timber interests of the country.

It is beyond the authority of the Interstate Commerce Commission to order a tap line to cease a division of rates as to lumber owned by it or by those having proprietary interest therein, if it is allowed such division as to lumber shipments by others.

If the division of joint rates between the principal carrier and the tap
line really amounts to a rebate or discrimination in favor of the tap
line owners, it is within the power and duty of the Interstate Com-
merce Commission to reduce such division to a proper point.

209 Fed. Rep. 244, affirmed.

THESE are all appeals from decrees of the United States
Commerce Court (209 Fed. Rep. 244) annulling orders of
the Interstate Commerce Commission refusing in whole
or in part to compel certain common carriers which had
filed schedules cancelling former schedules covering
through routes and joint rates with the Louisiana & Pacific
Railway Company, the Woodworth & Louisiana Central
Railway Company, the Mansfield Railway & Transporta-
tion Company and the Victoria, Fisher & Western Railroad
Company, appellees, hereinafter referred to as tap lines,
to establish or reëstablish through routes and joint rates
and to grant allowances and divisions to the tap lines.

The Commission, after an extensive investigation of the
tap lines in the lumber regions, particularly in the States
of Arkansas, Missouri, Louisiana and Texas, on April 23,
and May 14, 1912, filed its report and supplemental report
(23 I. C. C. 277, 549). The report deals at some length
with the manner in which logs and lumber are moved in
that territory and the practices attending such traffic.
The Commission found the identification of the road with
the industry, the necessity of incorporation to secure divi-
sions and allowances, the great amount in the aggregate
paid by the trunk lines to the tap lines, and the resulting
discrimination, the fact that allowances were dependent
upon the bargain the tap lines might exact from the trunk
lines for a proportion of their traffic and not upon the
amount of service rendered, and the fact that most of the
lumber mills were near public carriers and that the tap
lines would not be kept in operation if the mills were re-
moved. General principles for determining the character

of carriers were set forth, and the conclusion stated that the real relation of a tap line was a question to be decided upon the facts in each case.

The Commission entered upon a particular examination of the various lines under investigation, among others, the appellees in these appeals. It found:

The Louisiana & Pacific Railway Company, controlled by the R. A. Long interests, owning a controlling interest in the Hudson River Lumber Company, the King-Ryder Lumber Company, Longville Lumber Company and the Calcasieu Long Leaf Lumber Company, consists of the following tracks, all of which were originally constructed as private logging roads: (1) a track from De Ridder Junction, Louisiana (all of the lines involved in these cases are within that State), to Bundicks, a distance of eight miles. The mill of the Hudson River Lumber Company in whose interest this track is operated is located at De Ridder within a few hundred feet of the trunk lines; Bundicks is apparently a logging camp with a company store. (2) A track from Lilly Junction to Walla, about seven and one-half miles, the latter being a point in the woods where the King-Ryder Lumber Company has a commissary and where is located a small independent yellow-pine mill, owned by the Bundick Creek Lumber Company. The mill of the King-Ryder Company is at Bon Ami, a town of 2,000, located on the Lake Charles & Northern Railroad Company a short distance from and connected by it with Lilly Junction. (3) A track of two miles at Longville, a town of 2,000 people, where the Longville Lumber Company has its mill and a store, and where also are several independent stores. (4) A track of nine miles from Fayette to Camp Curtis, a place of 200 population, where the Calcasieu Long Leaf Lumber Company has a store, its mill being at Lake Charles. (5) A track of one mile from Bridge Junction to Lake Charles station. The towns De Ridder, Bon Ami, Lilly Junction, Longville, Fayette and

Lake Charles are connected by The Lake Charles & Northern Railroad, a Southern Pacific Railway Company line, originally built by the Long interests as a part of the Louisiana & Pacific, and sold to the Lake Charles & Northern with the reservation of trackage rights advantageous to the Louisiana & Pacific. By means of this arrangement the Louisiana & Pacific connects with the Kansas City Southern and the Santa Fe at De Ridder, with the Frisco at Fulton (a station south of Fayette) and with the Southern Pacific, Iron Mountain and Kansas City Southern at Lake Charles. Its equipment consists of 22 locomotives, 6 cabooses, 41 freight cars and 270 logging cars, and a private car used by its officers, who are connected with the lumber companies, in traveling around the country. The lumber companies have many miles of unincorporated logging tracks connecting with the Louisiana & Pacific at various points. There are a number of other stations on the line, among them Bannister, where the Brown Lumber Company owns a small independent mill.

The operation is this: The lumber companies load the logs and switch them over the logging spurs to connection with the tap line which hauls them to the mill, an average distance of 30 miles, for which no charge is made. The tap line switches the carloads of lumber from the mill at Lake Charles, a distance of three-quarters of a mile, to the Southern Pacific; at De Ridder only a few hundred feet to the trunk lines; from the Lake Charles mill to the Frisco a distance of 18 miles; from the Bon Ami mill to the Southern Pacific at Lake Charles a distance of 40 miles, and from the Longville mill to the Southern Pacific at Lake Charles a distance of 24 miles,—the average haul for the controlling companies being nearly 20 miles. By written agreement 50% of the lumber must be routed over the Frisco and 40% over the Southern Pacific, but this is not always done. 243,122 tons of lumber, as against 8,819 tons of merchandise were shipped in 1910, 98% of the whole ton-

nage being supplied by the controlling interests. The pas-
senger receipts for 1910 were $473.77. A logging train
runs daily on each branch and there is one "mixed" train,
loaded chiefly with logs and lumber, between Lake Charles
and De Ridder. The allowances paid by the trunk lines
range from 1½ to 5½c per 100 pounds out of their earnings
under the group-lumber rate. The operating revenue for
the year ending June 30, 1910, was $220,985.94, with op-
erating expenses of $145,433.69, and there was an accumu-
lated surplus of $73,581.07 on that date.

The Commission found that no charge was made for
hauling the logs to the mills by the tap line and that for
the short switching service allowances were made as above
stated, and concluded that it regarded the whole arrange-
ment as indefensible and unlawful, and saw no ground
upon which any allowance might lawfully be made.

The Woodworth & Louisiana Central Railway Com-
pany and the Rapides Lumber Company, situated at
Woodworth, are identical in interest. The mill is near the
Iron Mountain which has a spur track to the mill, and the
tap line has a standard gauge track from the mill to La
Moria, about six miles, where it connects with the South-
ern Pacific Railway, Texas & Pacific Railway and Chicago,
Rock Island & Pacific Railway, and a narrow gauge track
in the other direction for 18 miles whence spur tracks go
into the timber. The equipment consists of 1 standard
gauge locomotive, 5 narrow gauge locomotives and 2 stand-
ard and 9 narrow gauge cars. The steel in the logging
spurs and 4 of the narrow gauge locomotives used by the
lumber company on the spurs are owned by the tap line
and leased to the lumber company; while the right of way
for the narrow gauge track is leased from the lumber com-
pany.

The tap line hauls the logs from its terminus to the mill
without charge, where they are dumped by the trainmen
into the mill pond. The carloads of lumber are switched

by the tap line from the planing mill to the place where they are taken by the Iron Mountain, about 25 feet. About 95% of the lumber goes through La Moria, being switched there by the tap line; the allowances from the Iron Mountain out of through rates being from $1\frac{1}{2}$ to $5\frac{1}{2}$c per 100 pounds, while from the trunk lines at La Moria from 2 to $5\frac{1}{2}$c. There are no joint rates except on lumber. For the year ending June 30, 1910, there was 40,707 tons of freight handled for the lumber company and 2,100 tons of outside traffic. It has no passenger business. Its operations for that year showed a deficit, but there was a surplus from previous years of nearly $10,000. It files annual reports with the Commission.

The Mansfield Railway & Transportation Company and the Frost-Johnson Lumber Company are identical in interest. The tap line extends from Mansfield to a logging camp in the woods known as Hunter, a distance of about 16 miles and the line which was originally incorporated by the citizens of Mansfield in 1881 consisting of 2 miles of track from the town to a connection with the Texas & Pacific at Mansfield Junction. Later the Mansfield Company acquired the two-mile track and equipment, and the interests controlling it purchased a large amount of timber lands near Mansfield at a point called Oak Hill where a mill was built, and spur tracks were laid into the timber, which were later turned over to the Mansfield Company, with the free privilege reserved to the Lumber Company to operate logging trains between the timber and the mill, which operation is performed by a subsidiary company. The purchase price did not reflect the value of the reservation. There are about 25 miles of unincorporated logging tracks. The tap line also has a connection with the Kansas City Southern. It owns a locomotive, a passenger coach and a box car.

The service performed by the tap line is switching cars between the mill and the Kansas City Southern about

three-fourths of a mile, although the mill is within 300 feet of the Kansas City Southern and was formerly connected by a spur track which was abandoned and taken up, and to the Texas & Pacific, a distance of two and one-half miles. The tap line bears the expense of maintaining its tracks extending into the woods.

No other yellow-pine mills are served by the tap line, but there is a hardwood mill adjacent to the Frost-Johnson mill, obtaining a substantial portion of its logs from the latter company or subsidiaries, the price including delivery at the hardwood mill, the logs being hauled by the logging company under its trackage right. Some logs are also obtained from the Texas & Pacific, for the switching of which the hardwood mill pays the tap line $2.50 a car or less. The tap line maintains joint rates on hardwood as well as yellow-pine.

Practically no traffic other than that in which the Lumber Company is interested moves over the track from Mansfield to Hunter, but a good deal of outside traffic moves over the original two miles from Mansfield to Mansfield Junction. 16,539 tons of miscellaneous freight was handled during the year ending June 30, 1910, most of which passed over the Mansfield Junction branch, and much of which was for the controlling interests or their employés; while during the same time 28,596 tons of lumber were handled, 91.4 per cent. of which was supplied by the Lumber Company. A daily train is operated by the tap line in each direction on regular schedule, handling passengers, mail and express; but in 1910 the passenger revenues were only $1,209.76, while its freight revenues were $25,617.19.

The Commission noticed the abandonment of the 300 foot spur track and then the payment of an allowance of 1 to 4c per 100 pounds, and held that it was a mere manipulation of the situation in order to establish an unlawful relation; and also held that since the tap line crosses the

right of way of the Texas & Pacific within a short distance, the allowance of a like amount by the Texas & Pacific for switching from the mill to Mansfield and down to the junction was unlawful.

The Victoria, Fisher & Western Railroad Company and the Louisiana Long Leaf Lumber Company have the same stockholders and officers. The tap line extends from Victoria, where it connects with the Texas & Pacific, to Fisher, where it crosses the Kansas City Southern Railway, and then extends to Cain, in all about 31 miles. A part of the track was built some time ago and was acquired by the Lumber Company in 1900. In 1902 the Railroad Company was incorporated and its stock exchanged as a stock dividend for the line. There are about 25 miles of logging spurs and sidetracks. The equipment consists of 5 locomotives, 4 cabooses, 3 box cars, 1 flat car and 105 logging cars. It does not operate any trains on regular schedule. There are two mills owned by the Lumber Company, one about a mile from the junction with the Texas & Pacific and the other about half a mile from the tracks of the Kansas City Southern.

The tap line hauls the logs from the forest to the mill, charging $1.50 per 1,000 feet, which is supposed to cover only the service performed on the logging spurs and not the haul over the main track. The greater part of the lumber from Fisher is turned over to the Kansas City Southern, involving a one-half mile switch by the tap line, and from Victoria is moved by the tap line one mile to the Texas & Pacific; a small amount of the lumber from each mill is taken by the tap line to the more distant trunk line, but the same divisions are paid. The allowances range from ¾ to 4c per 100 pounds, and the joint rates are the same as the rates published from adjacent mills on the trunk lines, except traffic moving to Texas, for which 1¼c per 100 pounds is added to the junction-point rate. No passengers are carried, and of 316,676 tons

of freight for the year 1910, over 99% was furnished by the proprietary company. And the accumulated surplus at the end of June, 1910, was $13,509.17.

The Commission held that the tap line could not participate as a common carrier in joint rates on the products of the proprietary company, but said that the lumber rate of the trunk lines applied from the adjacent mills and that they might make a reasonable allowance for switching.

The Commission made an order in such matter on May 14, 1912, which it amended on October 30, 1912. The amended order, so far as these appeals are concerned, provided:

"The Commission upon the record finds in the case of the . . . Woodworth & Louisiana Central Railway Company; Mansfield Railway & Transportation Company; Louisiana & Pacific Railway Company; Victoria, Fisher & Western Railroad Company; that the tracks and equipment with respect to the industry of the several proprietary companies are plant facilities, and that the service performed therewith for the respective proprietary lumber companies in moving logs to their respective mills and performed therewith in moving the products of the mills to the trunk lines is not a service of transportation by a common carrier railroad but is a plant service by a plant facility; and that any allowances or divisions out of the rate on account thereof are unlawful and result in undue and unreasonable preferences and unjust discriminations, as found in the said reports," and it ordered that the trunk lines should cease and for two years abstain from making any such allowances to the tap lines named.

The Commission further ordered that if the trunk lines failed by a time stated, to reestablish the through routes and joint rates in effect on April 30, 1912, on traffic other than the products of the mills of certain proprietary com-

panies, among others, the appellees herein, it would upon proper petition enter an order requiring the establishment of such routes and rates or enter upon an inquiry with respect thereto, and further provided that all divisions of joint rates should be submitted to the Commission for approval.

The appellees thereupon by their several petitions filed in the United States Commerce Court sought to have the order of the Commission, so far as applicable to them, enjoined and annulled. The Interstate Commerce Commission, the Atchison, Topeka and Santa Fe Railway Company, the Gulf, Colorado and Santa Fe Railway Company and the Railroad Commission of Louisiana intervened. The Commerce Court said that the question was whether the Commission had acted arbitrarily and on improper considerations in determining under what circumstances a common carrier tap line would be deemed to be performing a mere plant service for a proprietary company, and held that as the service rendered to the proprietary and non-proprietary mills by the tap lines was the same, and as it was held to be a transportation service by an interstate common carrier as to the non-proprietary mills, it must be held to be a similar service as to the proprietary mills, and concluded that the Commission was without power to prohibit the making of joint rates by the trunk lines and the tap lines and the payment of some division of such rates to the tap lines for their services in hauling logs to and lumber from the proprietary mills, and annulled the order of the Commission in this respect and so far as it applied to the appellees.

The United States and the Interstate Commerce Commission, and the Atchison, Topeka & Santa Fe Railway Company and the Gulf, Colorado and Santa Fe Railway Company entered separate appeals from the decrees of the Commerce Court in the four cases instituted by the appellees.

*Mr. Blackburn Esterline,* Special Assistant to the Attorney General, with whom *The Solicitor General,* and *Mr. Karl W. Kirchwey,* Attorney, were on the brief, for the United States:

*Mr. Charles W. Needham,* with whom *Mr. Joseph W. Folk* was on the brief, for the Interstate Commerce Commission:

The trunk lines sought to cancel their tariffs prescribing divisions and allowances to the tap lines. The latter filed petitions with the Commission, complaining of this action. They requested that an answer be required from each trunk line, that an investigation be entered into, and that through routes and joint rates be established between the trunk lines and the tap lines. The Commission found that the tap lines were plant facilities of the lumber companies, denied the relief prayed, and by a single order dismissed the several petitions. This order was a negative order. As no affirmative order was entered against the tap lines, which they might annul or enjoin, the Commerce Court was without jurisdiction. *Proctor & Gamble Co.* v. *United States,* 225 U. S. 282; *Hooker* v. *Knapp,* 225 U. S. 302.

In cases of preference and discrimination, this court has held that judicial review is limited to the single inquiry, Was there substantial evidence before the Commission to support the order? In their petitions to the Commerce Court, the tap lines alleged much matter other and different from that which they adduced before the Commission. They also offered new evidence. Among other things, they sought to show conditions which they had created after the hearing before the Commission relating to the operation of the tap lines, and also to swell substantially the volume of the tonnage handled for others than the proprietary companies. They now seek to destroy the report and order of the Commission with a record which was not before it. Congress did not contemplate a retrial of the same issues of fact before another tribunal.

The Commerce Court was right in disregarding the testimony taken before it, and in striking it from the record. *I. C. C.* v. *Un. Pac. R. R. Co.,* 222 U. S. 541, 550; *I. C. C.* v. *Louis. & Nash. R. R. Co.,* 227 U. S. 88; *United States* v. *Balt. & Ohio R. R. Co.,* 225 U. S. 306, 323.

The Commission had the right to look behind the fact of separate incorporation to ascertain the actual relations of the parties. The tap lines are not *bona fide* common carriers of the traffic of the lumber companies, but they are mere devices created for the purpose of taking over the switch tracks and logging equipment of the several lumber companies, and converting allowances, which would otherwise be bald rebating transactions, into private divisions between the appellee tap lines and the trunk lines, in order to evade the provisions of the Act to Regulate Commerce, and simultaneously to maintain advantages over other shippers of lumber. *Miller & Lux* v. *Canal Co.,* 211 U. S. 293; *So. Pacific Co.* v. *I. C. C.,* 219 U. S. 498, 521; *United States* v. *Union Stock Yard,* 226 U. S. 286, 304; *United States* v. *Lehigh Valley R. R. Co.,* 220 U. S. 257; *Fourche River Co.* v. *Lumber Co.,* 230 U. S. 316; *Crane Iron Works* v. *United States,* 209 Fed. Rep. 238.

The particular preferences and advantages to the lumber companies may be thus summarized: 1. The allowance of 1½c to 5c per 100 pounds from the freight rate, and the resultant advantages of these lumber companies over their competitors in the transportation and sale of lumber in the markets. Some of the mills turn out 2,500 cars per year; 4c per 100 pounds, on the basis of 50,000 pounds to the car, would amount to $50,000 to a single company within a single year. 2. The use by the lumber companies of the tracks, switches and sidings as holding yards for loaded and empty cars, which enables them to evade all demurrage and car service charges. The tap lines hold for the lumber companies the cars of the trunk lines on the basis of 50c a day after 6 days

free time, instead of the lumber companies paying the usual $1 and $2 per day over 48 hours free time. 3. The use of free interstate transportation over the trunk lines distributed wholesale to the officers and agents of the lumber companies and used by them in travelling in the interest of the lumber companies, or in their own interest.

In order to gain these preferences and discriminations, the lumber companies are making the transportation of their enormous traffic a matter of bargain with all of the trunk lines, and the sale of it to the one or two which pays the highest allowances. With the power wielded in controlling the routing, the lumber companies are forcing the trunk lines to make allowances to the tap lines, of which the stockholders of the lumber companies are getting the benefit.

The conclusions reached by the Commission did not proceed upon arbitrary and unlawful distinctions and are supported by substantial evidence.

The switching service within 3 miles of the trunk line, being one which the trunk line held itself out to perform under the through rate, was a service "connected with transportation" when performed by the shipper or its agent. Switching for a greater distance so performed was purely an accessorial service. *Taenzer & Co.* v. *C., R. I. & P. Ry. Co.*, 191 Fed. Rep. 543; *C. & A. Ry. Co.* v. *United States*, 156 Fed. Rep. 558; affirmed, 212 U. S. 563; *Central Yellow Pine Association* v. *V. S. & P. R. Co.*, 10 I. C. C. 193; *Fourche River Co.* v. *Bryant Lumber Co.*, 230 U. S. 316, 322; *United States* v. *B. & O. R. R. Co.*, 231 U. S. 274; *I. C. C.* v. *Diffenbaugh*, 222 U. S. 42; *Matter of the Transportation of Hutchinson Salt*, 10 I. C. C. 1, 9; *Star Grain Co.* v. *A., T. & S. F. Ry. Co.*, 17 I. C. C. 338; *Fathauer Co.* v. *St. L., I. M. & S. Ry. Co.*, 18 I. C. C. 517; *Industrial Lumber Co.* v. *S. L. W. & G. Ry. Co.*, 19 I. C. C. 50; *Santa Fe Ry.* v. *Grant Bros.*, 228 U. S.

177, 185; *Crane Iron Works* v. *United States*, 209 Fed. Rep. 238; *Kaul Lumber Co.* v. *Central of Georgia Ry. Co.*, 20 I. C. C. 450; *United States* v. *B. & O. Ry. Co.*, 231 U. S. 274; *General Electric Co.* v. *N. Y. C. & H. R. R. R. Co.*, 14 I. C. C. 237; *Solvay Process Co.* v. *D., L. & W. R. R. Co.*, 14 I. C. C. 246; *Re Allowances for Sugar Transfer*, 14 I. C. C. 619; *C. & O. Ry. Co.* v. *Standard Lumber Co.*, 174 Fed. Rep. 107; *Industrial Railways Case*, 29 I. C. C. 212; *Le Roy Fibre Co.* v. *C., M. & St. P. Ry. Co.*, 232 U. S. 340, 354; *Am. Sugar Co.* v. *D., L. & W. R. R. Co.*, 200 Fed. Rep. 652, 656; *Mitchell Coal Co.* v. *Penna. R. R. Co.*, 230 U. S. 247, 264.

A plant facility tap line performing this service within the 3 mile limit was entitled to an allowance under § 15, but to no division out of the through rate. A common carrier tap line was entitled to a division or allowance out of the through rate on a haul of either more or less than 3 miles. The movement of the logs from the forest to the mill was not a transportation service to be paid for out of the through rate, but an accessorial service for which the shipper should pay.

Any allowance for switching within 1,000 feet of a trunk line was a mere device to effect an unlawful payment. These findings are within the principles approved by this court in *Mitchell Coal Co.* v. *Penna. R. R. Co.*, 230 U. S. 247, 265, to the effect that an allowance to a tap line under § 15 "is lawful only when the trunk line prefers, for reasons of its own and without discrimination, to have the lumber company perform the service."

The Commerce Court affirmed in all respects the report and order of the Commission, with the single and sole exception that the Commission had arbitrarily found the tap lines to be plant facilities of the lumber companies, and impliedly recognized them as common carriers of an insignificant amount of traffic of a few other shippers, amounting to only 1 or 2 per cent of the whole.

The tap lines, the lumber companies, and the trunk lines, in all of their arrangements among themselves, and in various forms, carefully and clearly separated the traffic of the proprietary companies from the traffic of other shippers, and the Commission simply treated the case as the parties themselves had made it.

The preferences and discriminations found by the Commission do not arise out of the insignificant amount of traffic handled for shippers other than the proprietary companies. Such shippers do not receive the allowance of 1½c to 5c, or free demurrage and car service, or free passes. Rebates are not paid to the public on insignificant amounts of traffic, but they are paid to private parties on large volumes of traffic.

Any allowance whatever to as many as 57 tap lines was stricken down as unlawful, and the petitions were dismissed by negative orders. To 35 other tap lines the Commission allowed either a small division of the rate or an arbitrary switching charge, in the amounts which the Commission found they were entitled to receive for the service which they rendered. To 5 other tap lines the Commission refused any allowance on the traffic of the proprietary companies. No trunk line has come forward to challenge the validity of the order. Those which were brought in by summons have answered that they would allow the United States to defend. Out of a total of 97 tap lines against which the order was directed, 92 have accepted its terms. Only 5 have objected. Twice the report of the Commission has been sanctioned by this court to the extent of citing it as authority. *Mitchell Coal Co.* v. *Penna. R. R. Co.*, 230 U. S. 247, 264, 265; *Fourche River Co.* v. *Bryant Lumber Co.*, 230 U. S. 316, 322. The five objecting parties are met with the powerful presumptions of validity which accompany the order, which are reënforced by the nonaction of the great majority of the interested parties, and the sanction which this court

has already given to the report in the cases already
cited.

*Mr. Robert Dunlap* and *Mr. James L. Coleman*, with
whom *Mr. T. J. Norton* and *Mr. Gardiner Lathrop* were
on the brief, for the Atchison, Topeka & Santa Fe Rail-
way Company, and other trunk line railway companies,
appellants in Nos. 830, 832, 834 and 836:

The tap line division is a rebate and the various steps
taken by appellees in their attempts to legalize such re-
bate are mere devices to evade the payment of the pub-
lished tariff rate in full.

The incorporation of the various tap line railroads and
the other steps taken by them were for the sole purpose of
continuing under the name of a division the old open rebate
which was paid direct to the lumber companies. Masquer-
ading as railroads, the lumber companies were making
their traffic a matter of bargain and sale and by the device
of a secret division were compelling the trunk lines to bid
against each other in the dark for such business. Such
was the proper finding of the Interstate Commerce Com-
mission.

The points raised by appellees before the Commerce
Court and before the Interstate Commerce Commission are
without merit. The facts of record and the law are that:

The service performed by each of the appellee railroads
herein is not a service of transportation by a common car-
rier railroad within the meaning of the Act to Regulate
Commerce, but is an industrial service to the plant; the
appellee railroads are plant facilities and perform a plant
facility service for the proprietary lumber companies;
there was abundant evidence upon which the Commission
could base its finding that the participation by the appellee
railroad in joint rates upon the logs and lumber of the
proprietary lumber companies constitutes an undue and
unreasonable preference and subjects other shippers to

unjust discrimination within the meaning of the Act to Regulate Commerce.

The Commission's order does not result in undue or unreasonable preference or unjust discrimination within the meaning of the Act to Regulate Commerce, either as between common carriers subject to the Act to Regulate Commerce, or as between shippers.

The order does not deprive the appellees of their rights under the Constitution of the United States.

The Commodities Clause does not repeal the Act to Regulate Commerce with respect to the prohibitions against rebating and discriminations.

Cases heretofore relied upon by appellees can be distinguished.

In support of these contentions, see *Armour Packing Co.* v. *United States,* 209 U. S. 56; *Blackstone* v. *Miller,* 188 U. S. 206; *Brundred* v. *Rice,* 49 Oh. St. 640; *Central Pine Assn.* v. *Shreveport &c. R. R. Co.,* 10 I. C. C. 193; *Chicago & Alton R. R. Co.* v. *United States,* 156 Fed. Rep. 558; 1 Cook on Corporations, 6th ed., 31; 2 Cook on Corporations, 6th ed., 1972, 1974, 1975, 1983, 1985, 1986, 1987; *Corporation Tax Cases,* 220 U. S. 107; *Crane Iron Works* v. *United States,* 209 Fed. Rep. 238; *Crane Iron Works* v. *Central R. R. Co.,* 17 I. C. C. 514; *Crane Railroad Co.* v. *Phila. & Reading Ry. Co.,* 15 I. C. C. 248; *Demko* v. *Carbon Hill Coal Co.,* 136 Fed. Rep. 162; *Eastern & Western Ry. Co.* v. *Rayley,* 157 Fed. Rep. 532; *General Electric Co.* v. *N. Y. C. & H. R. R.,* 14 I. C. C. 237; *Hunter* v. *Baker Vehicle Co.,* 190 Fed. Rep. 665; *Ill. Cent. R. R. Co.* v. *Int. Com. Comm.,* 206 U. S. 441; *Industrial Railways Case,* 29 I. C. C. 212; *Re Divisions of Joint Rates,* 10 I. C. C. 661; *Re Hutchinson Salt,* 10 I. C. C. 1; *Re Investigation of Tap-line Connections,* 23 I. C. C. 277, 283; *Int. Com. Comm.* v. *C., R. I. & P. Ry. Co.,* 218 U. S. 88; *Int. Com. Comm.* v. *D., L. & W. R. R. Co.,* 220 U. S. 235; *Int. Com. Comm.* v. *L. & N. R. R. Co.,* 227 U. S.

88; *Re Rieger,* 157 Fed. Rep. 609; *Kendall* v. *Klapperthal Co.,* 202 Pa. St. 596, 52 Atl. Rep. 92; *Lehigh Mining Co.* v. *Kelly,* 160 U. S. 327; *Louis. & Nash. R. R. Co.* v. *Mottley,* 219 U. S. 467; *La. & Pac. Ry. Co.* v. *United States,* 209 Fed. Rep. 247; *Martin* v. *Martin Co.,* 88 Atl. Rep. 612; *Miller & Lux* v. *East Side Canal Co.,* 211 U. S. 293; *Mc-Kilvergan* v. *Alexander Lumber Co.,* 102 N. W. Rep. 332; *New York, N. H. & H. R. R. Co.* v. *Int. Com. Comm.,* 200 U. S. 361; *Northern Securities Co.* v. *United States,* 193 U. S. 197; *Peavey Elevator Case,* 222 U. S. 42; *Procter & Gamble* v. *United States,* 225 U. S. 282; *Santa Fe &c. Ry. Co.* v. *Grant Bros.,* 228 U. S. 177; *Seymour* v. *Spring Forest Assn.,* 144 N. Y. 333; *Solvay Process Co.* v. *D., L. & W. R. R. Co.,* 14 I. C. C. 246; *So. Pac. Terminal Co.* v. *Int. Com. Comm.,* 219 U. S. 498; *Swift* v. *United States,* 196 U. S. 375; *Union Pacific R. R. Co.* v. *Updyke,* 222 U. S. 215; *Taenzer & Co.* v. *C., R. I. & P. Ry. Co.,* 170 Fed. Rep. 240; *S. C.,* 191 Fed. Rep. 543; *United States* v. *Bags of Coffee,* 8 Cr. 415; *United States* v. *B. & O. R. R. Co.,* 231 U. S. 274; *United States* v. *Del. & Hud. R. Co.,* 213 U. S. 366; *United States* v. *Milwaukee Transit Co.,* 142 Fed. Rep. 247; *United States* v. *Union Stock Yard,* 226 U. S. 286; *Wade* v. *Lutcher,* 74 Fed. Rep. 517; *Watson* v. *Bonfils,* 116 Fed. Rep. 157; *Williams* v. *Northern Lumber Co.,* 113 Fed. Rep. 382.

*Mr. Luther M. Walter* and *Mr. H. M. Garwood,* with whom *Mr. W. R. Thurmond* was on the brief, for appellees:

The service performed by each of the appellee railways is a service of transportation by a common carrier within the meaning of the Act to Regulate Commerce.

Appellee railways are not plant facilities and do not perform a plant facility service for the lumber companies, appellees herein.

There was no evidence upon which the Interstate Commerce Commission could base its finding that the participation by the appellee railways in joint rates upon the

logs and lumber of the appellee lumber companies constitutes an undue or unreasonable preference, or subjects any party to any illegal discrimination within the meaning of the Act to Regulate Commerce.

The Commission's order results in undue and unreasonable preference and unjust discriminations within the meaning of the Act to Regulate Commerce as between carriers subject to the Act to Regulate Commerce and as between shippers.

The order deprives appellees of their rights under the Constitution of the United States.

The order of the Commission expressly overrides the exception contained in the Commodities Clause of the Act to Regulate Commerce.

In support of these contentions, see *Amos Kent Co.* v. *Assessor*, 114 Louisiana, 862; *Butte & Pac. Ry. Co.* v. *Montana Union R. Co.*, 16 Montana, 504; *Bridal Veil Lumber Co.* v. *Johnson*, 30 Oregon, 581; 46 Pac. Rep. 790; *Beaumont &c. R. R.* v. *A., T. & S. F.*, 24 I. C. C. 161, 163; *Chapman* v. *Trinity Valley Ry. Co.*, 138 S. W. Rep. 440; *Columbia Conduit Co.* v. *Commonwealth*, 90 Pa. St. 307; *Contra Costa Ry. Co.* v. *Moss*, 23 California, 323; *Commodities Clause Case*, 213 U. S. 366–417; *Crane Iron Works* v. *United States*, 209 Fed. Rep. 238; *DeCamp* v. *Hibernia Ry. Co.*, 47 N. J. Law, 46; *Diffenbaugh Case*, 176 Fed. Rep. 409; *Elevator Cases*, 14 I. C. C. 324; 176 Fed. Rep. 409; 222 U. S. 42; *Federal Sugar Case*, 20 I. C. C. 200; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196; *Greasy Creek Co.* v. *Ely Jellico Coal Co.*, 132 Kentucky, 692; *General Electric Co.* v. *N. Y. C. & H. R. R. R. Co.*, 14 I. C. C. 237; *Kans. & Tex. Ry. Co.* v. *North West. Coal Co.*, 161 Missouri, 288; 61 S. W. Rep. 864; *Kettle River Ry. Co.* v. *Eastern Ry. Co.*, 43 N. W. Rep. 473; *La. & Pac. Ry. Co.* v. *United States*, 209 Fed. Rep. 247; *Manufacturers Ry. Co.* v. *St. L., I. M. & So. Ry.*, 21 I. C. C. 304, 312; *Madura Railway Co.* v. *Raymond Granth Co.*, 86 Pac. Rep. 27; *Mitchell Coal Co.* v.

*Pennsylvania Ry. Co.*, 230 U. S. 247, 264; *Solvay Process Co.* v. *D., L. & W. R. R. Co.*, 14 I. C. C. 246; *Ulmer* v. *Railway Co.*, 98 Maine, 581; 57 Atl. Rep. 1001; *Union Stock Yard Case*, 226 U. S. 286; *United States* v. *Balt. & Ohio R. R. Co.*, 231 U. S. 274.

*Mr. Wylie M. Barrow*, with whom *Mr. Ruffin G. Pleasant*, Attorney General of the State of Louisiana, was on the brief, for the Railroad Commission of Louisiana, intervenor and appellee:

The interest of the State of Louisiana in these cases lifts them from the category of mere private controversy and places them on the plane of public questions.

Many important railroads now operating in Louisiana originated as tap lines.

There is a public necessity for the tap line railroads.

The questions here presented, being public in their nature, and not merely private controversy, are of great interest to the people of the State of Louisiana.

In support of the contentions of the State, see *Agee* v. *Louis. & Nash. R. R. Co.*, 152 Alabama, 344; *Amos Kent Brick Co.* v. *Tax Collector*, 114 Louisiana, 862; *Butte & Pac. R. Co.* v. *Montana Union Ry.*, 16 Montana, 504; *Caldwell* v. *Richmond &c. R. Co.*, 89 Georgia, 550; *Central Yellow Pine Ass'n* v. *Vicksburg &c. R. R. Co.*, 10 I. C. C. 193; *Chi., B. & Q. R. R. Co.* v. *Cutts*, 94 U. S. 155; *Chi., B. & Q. R. Co.* v. *Porter*, 43 Minnesota, 527; *De Camp* v. *Hibernia Ry. Co.*, 47 N. J. Law, 43; *Denver &c. R. Co.* v. *Cahill*, 8 Colo. App. 158; *Re Divisions of Joint Rates*, 10 I. C. C. 385; *Dock Co.* v. *Garrity*, 115 Illinois, 155; *Lake Superior R. R. Co.* v. *United States*, 93 U. S. 442; *McCloud Lumber Co.* v. *So. Pac. Co.*, 24 I. C. C. 89; *National Dock Co.* v. *Central R. R. Co.*, 32 N. J. Eq. 755; *N. Y. Cent. R. R. Co.* v. *Lockwood*, 17 Wall. 357; *Phillip* v. *Watson*, 63 Iowa, 28; 18 N. W. Rep. 859; *Star Grain Co.* v. *Atchison &c. Ry. Co.*, 17 I. C. C. 338; *S. C.*, 14 I. C. C. 364; *Tap Line*

*Cases*, 23 I. C. C. 277; *Re Transportation Hutchinson Salt*, 10 I. C. C. 1; *Ulmer* v. *Lime Rock Ry. Co.*, 98 Maine, 579; *United States* v. *Union Stock Yard*, 226 U. S. 286; *Winona R. R. Co.* v. *Blake*, 94 U. S. 180.

MR. JUSTICE DAY, after making the foregoing statement, delivered the opinion of the court.

A preliminary objection is made to the jurisdiction of the Commerce Court in that the order of the Commission is not reviewable because merely of a negative character. The Commerce Court examined this question and in view of the amended order of October 30, 1912, reached the conclusion that the order was affirmative in its nature and of a character permitting of review by proper proceedings in that court under the act giving it jurisdiction in such cases. We find no reason to differ with this conclusion and are of opinion that the Commerce Court had jurisdiction in the case.

It is further insisted upon the authority of *Procter & Gamble Co.* v. *United States*, 225 U. S. 282, and other cases in this court which have followed that decision, that in the present cases the decision rests upon conclusions of the Commission as to matters of fact only, which are within the sole jurisdiction of that body and not reviewable in the courts. But we shall consider the case upon the findings of fact preceding this opinion, which are identical with those made by the Commission, and test the conclusions reached as matters of law, giving proper consideration to matters of fact which are not in dispute.

The final decree of the Commerce Court vacated and set aside the portion of the Commission's order reading as follows:

"That the tracks and equipment with respect to the industry of the several proprietary companies are plant facilities, and that the service performed therewith for the

respective proprietary lumber companies in moving logs to their respective mills and performed therewith in moving the products of the mills to the trunk lines is not a service of transportation by a common carrier railroad, but is a plant service by a plant facility; and that any allowances or divisions out of the rate on account thereof are unlawful and result in undue and unreasonable preferences and unjust discriminations, as found in the said reports;

"3. It is Ordered, That the principal defendants [trunk lines, naming them], be, and they are hereby notified and required to cease and desist, and for a period of two years hereafter, or until otherwise ordered, to abstain from making any such allowances to any of the above named parties to the record in respect of any such above described service."

The question now before this court is the correctness of this decree.

A perusal of the findings and orders of the Commission make it apparent that the grounds of decision upon which it proceeded were two, first, that these roads were mere plant facilities, second, that they were not common carriers as to proprietary traffic. The Commission held that before incorporation they were plant facilities and that after incorporation they remained such. What the Commission means by plant facilities may be gathered from a consideration of some of its decisions. In *General Electric Co. v. N. Y. C. & H. R. R. R.*, 14 I. C. C. 237, a network of interior switching tracks constructed to meet the necessities of the business, were held to be mere plant facilities. The same principle was applied to the internal trackage of large industrial plants in *Solvay Process Company v. Delaware, Lackawanna & Western R. R. Co.*, 14 I. C. C. 246. These systems of internal trackage were not common carriers, and, however extensive, were intended to and did furnish service for the plants which owned and

operated them. But a common carrier performing service as such, regulated and operated under competent authority, as observed by Commissioner Prouty in *Kaul Lumber Co.* v. *Central of Georgia Railway Co.*, 20 I. C. C. 450, 456, is no longer a mere appendage of a mill "but a public institution." It thus becomes apparent that the real question in these cases is the true character of the roads here involved. Are they plant facilities merely or common carriers with rights and obligations as such?

It is insisted that these roads are not carriers because the most of their traffic is in their own logs and lumber and that only a small part of the traffic carried is the property of others. But this conclusion loses sight of the principle that the extent to which a railroad is in fact used, does not determine the fact whether it is or is not a common carrier. It is the right of the public to use the road's facilities and to demand service of it rather than the extent of its business which is the real criterion determinative of its character. This principle has been frequently recognized in the decisions of the courts. We need not cite the many state cases in which it has been so held, in view of the fact that the same principle was laid down in the late case of *Union Lime Co.* v. *Chicago & N. W. Ry. Co.*, 233 U. S. 211. In that case the Supreme Court of Wisconsin sustained the extension of a spur track to reach the quarries and lime kilns of a single company as a public use authorizing the exercise of the right of eminent domain, and this court affirmed the judgment. Dealing with the contention that the Wisconsin statute was invalid because it authorized action appropriating property upon the exigency of a private business, this court said (p. 221):

"A spur may, at the outset, lead only to a single industry or establishment; it may be constructed to furnish an outlet for the products of a particular plant; its cost may be defrayed by those in special need of its service at the

time. But none the less, by virtue of the conditions under which it is provided, the spur may constitute at all times a part of the transportation facilities of the carrier which are operated under the obligations of public service and are subject to the regulation of public authority. As was said by this court in *Hairston* v. *Danville & Western Rwy. Co.*, *supra* (p. 608) [208 U. S. 598]: 'The uses for which the track was desired are not the less public because the motive which dictated its location over this particular land was to reach a private industry, or because the proprietors of that industry contributed in any way to the cost.' There is a clear distinction between spurs which are owned and operated by a common carrier as a part of its system and under its public obligation and merely private sidings. See *De Camp* v. *Hibernia R. R. Co.*, 47 N. J. Law, 43; *Chicago &c. R. R. Co.* v. *Porter*, 43 Minnesota, 527; *Ulmer* v. *Lime Rock R. R. Co.*, 98 Maine, 579; *Railway Company* v. *Petty*, 57 Arkansas, 359; *Dietrich* v. *Murdock*, 42 Missouri, 279; *Bedford Quarries Co.* v. *Chicago &c. R. R. Co.*, 175 Indiana, 303."

The Commission has recognized this principle as applicable to tap lines, for in the *Central Yellow Pine Association* v. *The Vicksburg, Shreveport & Pacific R. R. Co.*, 10 I. C. C. 193, 199, it said:

"While these logging roads are almost or quite without exception mill propositions at the outset, built exclusively for the purpose of transporting logs to the mill, they soon reach a point where they engage in other business to a greater or less extent. As the length of the road increases, as the lumber is taken off and other operations obtain a foothold along the line, various commodities besides lumber are transported, and this business gradually develops until in several cases what was at first a logging road pure and simple has become a common carrier of miscellaneous freight and passengers. Almost all these lines, even where they are run as private enterprises,

do more or less outside transportation, and it would be
difficult to draw any line of demarkation between the
logging road as such and the logging road which has be-
come a general carrier of freight."

This representation it is contended by the Attorney
General of Louisiana, who appears here in behalf of the
Louisiana Railroad Commission, intervenor, is aptly
descriptive of the growth and development of railroads
in that State.

Furthermore, these roads are common carriers when
tried by the test of organization for that purpose under
competent legislation of the State. They are so treated by
the public authorities of the State, who insist in this case
that they are such and submit in oral discussion and
printed briefs cogent arguments to justify that conclusion.
They are engaged in carrying for hire the goods of those
who see fit to employ them. They are authorized to ex-
ercise the right of eminent domain by the State of their in-
corporation. They were treated and dealt with as common
carriers by connecting systems of other carriers, a cir-
cumstance to be noticed in determining their true char-
acter. *United States* v. *Union Stock Yard & Transit Co.*,
226 U. S. 286. They are engaged in transportation as that
term is defined in the Commerce Act and described in
decisions of this court. *Coe* v. *Errol*, 116 U. S. 517;
*Covington Stock Yds. Co.* v. *Keith*, 139 U. S. 128; *Southern
Pac. Term. Co.* v. *Interstate Com. Comm.*, 219 U. S. 498;
*United States* v. *Union Stock Yard Co., supra.*

Applying the principles which we have stated as deter-
minative of the character of these roads and without
repeating the facts concerning them, they would seem to
fill all the requirements of common carriers so employed,
unless the grounds upon which they were determined not
to be such by the Commission are adequate to that end.
The Commission itself as to all shippers other than those
controlled by the so-called proprietary companies, treated

them as common carriers, for it has ordered the trunk lines to reëstablish through routes and joint rates as to such traffic. But says the Government, and it insists that this fact alone might well control the decision, the roads are owned by the persons who also own the timber and mills which they principally serve.

This fact is not shown to be inconsistent with the laws of the State in which they are organized and operated. On the contrary the public authorities of that State are here insisting that these companies are common carriers. Congress has not made it illegal for roads thus owned to operate in interstate commerce. While Congress in enacting the Commodities Clause amending § 1 of the Act to Regulate Commerce (June 29, 1906, c. 3591, 34 Stat. 584) sought to divorce transportation from production and manufacture and to make transportation a business of and by itself unallied with manufacture and production in which a carrier was itself interested, the debates, which may be resorted to for the purpose of ascertaining the situation which prompted this legislation, show that the situation in some of the States as to the logging industry and transportation was sharply brought to the attention of Congress and led to the exemption from the Commodities Clause of timber and the manufactured products thereof, thus indicating the intention to permit a railroad to haul such lumber and products although it owned them itself. And that Congress had the constitutional power to enact such exemption was held in *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, 416–7. This declaration of public policy which is now part of the Commerce Act cannot be ignored in interpreting the power and authority of the Commission under the act. The discussion resulting in the action of Congress shows that railroads built and owned by the same persons who own the timber were regarded as essential to the development of the timber regions in the Southwest

and the necessity of such roads was dwelt upon and set forth with ample illustration by Commissioner Prouty in his concurring opinion in this case.

As we have said, the Commission by its order herein required the trunk lines to reëstablish through routes and joint rates as to property to be transported by others than the proprietary owners over the tap lines. This order would of itself create a discrimination against proprietary owners, for lumber products are carried from this territory upon blanket rates applicable to all within its limits. It follows that independent owners would get this blanket rate for the entire haul of their products while proprietary owners would pay the same rate plus the cost of getting to the trunk line over the tap line. The Commission, by the effect of its order, recognizes that railroads organized and operated as these tap lines are, if owned by others than those who own the timber and mills, would be entitled to be treated as common carriers and to participate in joint rates with other carriers. We think the Commission exceeded its authority when it condemned these roads as a mere attempt to evade the law and to secure rebates and preferences for themselves.

It is doubtless true, as the Commission amply shows in its full report and supplemental report in these cases, that abuses exist in the conduct and practice of these lines and in their dealings with other carriers which have resulted in unfair advantages to the owners of some tap lines and to discriminations against the owners of others. Because we reach the conclusion that the tap lines involved in these appeals are common carriers, as well of proprietary as non-proprietary traffic, and as such entitled to participate in joint rates with other common carriers that determination falls far short of deciding, indeed does not at all decide, that the division of such joint rates may be made at the will of the carriers involved and without any power of the Commission to control. That body has the

authority and it is its duty to reach all unlawful discrim-
inatory practices resulting in favoritism and unfair advan-
tages to particular shippers or carriers. It is not only
within its power, but the law makes it the duty of the
Commission to make orders which shall nullify such
practices resulting in rebating or preferences, whatever
form they take and in whatsoever guise they may appear.
If the divisions of joint rates are such as to amount to
rebates or discriminations in favor of the owners of the
tap lines because of their disproportionate amount in
view of the service rendered, it is within the province of the
Commission to reduce the amount so that a tap line shall
receive just compensation only for what it actually does.

For the reasons stated, we think the Commerce Court
did not err in reaching its conclusion and decision, and its
judgment is

*Affirmed.*