### PACIFIC SPRUCE CORPORATION v. McCOY et al.

#### (District Court, D. Oregon. December 17, 1923.)

1. Carriers ⇐4—Not essential to constitute a "common carrier" that it carry both passengers and freight.

    It is not essential to constitute a "common carrier" that it carry both passengers and freight or all kinds of freight.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Common Carrier.]

2. Carriers ⇐4—Actual service determines status as common carrier or public utility.

    In determining whether a utility is a common carrier or public utility, whether it is operated by a foreign or domestic corporation, or whether the corporation is authorized to perform a public service by its articles, is not controlling, but the important thing is what it does.

3. Carriers ⇐4—Extent of use does not determine common carrier.

    The extent to which a railroad is in fact used does not determine whether it is or is not a common carrier, but the right of public use.

4. Carriers ⇐5—Property devoted to a "public use" is, to the extent of the public interest created, subject to public control.

    When one in effect sets apart his property to a use in which the public has an interest, he in effect grants such use to the public and as a consequence must submit to be controlled by the public for the common good to the extent of the interest he has created.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Public Use.]

5. Carriers ⇐4—Railroad built and used as private carrier held not subject to jurisdiction of Oregon Public Service Commission as a common carrier.

    The United States built a railroad for use in the transportation of spruce timber for war purposes only, and later conveyed title to a corporation owned by the government. Such corporation, pending completion of the road, granted a permit to a third party, revocable at any time, to use a portion of the road for the carrying of passengers and freight. Subsequently it revoked the permit and sold the road to complainant, which bought it for use solely as a private logging road. Oregon Public Service Commission Act (Or. L. § 5829) provides that it shall not apply to "logging or other private railroads not doing business as common carriers." Held, that the temporary use of the road by the licensee did not impress the property with a public use, and that the Oregon Public Service Commission was without jurisdiction to require its operation as a common carrier.

In Equity. Suit by the Pacific Spruce Corporation against Newton McCoy and others, and the Public Service Commission of Oregon. Decree for complainant.

This is a suit by plaintiff to enjoin the Public Service Commission of the State of Oregon from enforcing an order made and entered by it December 21, 1922, whereby plaintiff was required to provide and maintain suitable and adequate facilities, equipment, and service for the transportation of freight

and passengers generally over its line of railway between South Beach, on Yaquina Bay, and Waldport and intermediate points, all in Lincoln county, Or., in accordance with certain findings of the commission, which are made a part of the report.

Prior to the 10th day of October, 1918, the United States of America, acting through its duly authorized officers and representatives, had, with a view to aiding in spruce production for war purposes, constructed in large measure a railroad extending southward from Yaquina Bay, near South Beach, to the town of Waldport, and a distance of about 7½ miles beyond. In the meanwhile, the United States Spruce Production Corporation, a state of Washington corporation, was duly organized and incorporated, the capital stock of which was subscribed and owned exclusively by the general government. Its objects and purposes, among others, were "to engage in the logging business and incidental thereto to build, construct, maintain and operate logging railways," and, further, "to locate, construct, buy, lease or otherwise acquire, and to own, maintain and operate railroads of any description whatsoever."

On the 10th of October aforesaid, the government conveyed the railroad, with the Toledo sawmill under construction and other properties, to the United States Spruce Production Corporation, which entered into possession thereof. Subsequently, on December 17, 1920, the Spruce Production Corporation entered into a contract with the plaintiff, a Delaware corporation, whereby it agreed to sell, and the latter agreed to purchase, the mill property at Toledo, the railroad, together with its extensions, terminals, station buildings, etc., and two certain tracts of timber land specifically described, into the confines of a portion of which the railroad extended. By the terms of the contract, the Spruce Production Corporation retains the title to all such property until the consideration therefor shall be fully paid.

By its amended articles of incorporation, the Pacific Spruce Corporation has embodied among its specified objects and purposes the following:

"To build or otherwise acquire a railroad running from a point at or near Yaquina, Lincoln county, Oregon, to a point at or near Florence, Lane county, Oregon, and spurs and branches radiating therefrom. To operate such railroad as a private carrier only."

It is alleged, and stands unrefuted, "that the said railroad was constructed wholly as a war utility and for the purpose particularly of transporting spruce logs from a large spruce forest located near the southern terminus of the said road, to the end that the said logs might be manufactured into spruce lumber suitable for the making of various types of air craft."

On May 29, 1919, the Spruce Production Corporation granted to one Lee Doty a permit to operate the railroad, from the northern terminus thereof to Waldport, by the use of a certain type of locomotive, with flanged wheels, so constructed as to run upon the railroad tracks, designed for carrying passengers and freight; all rolling stock and equipment to be furnished by the operator; he to keep and maintain the road and roadbed in repair, and, at his own expense, under the direction and supervision of the corporation, to make minor repairs thereto and reimburse the corporation for any damage caused to the rails or roadbed, and to return the railroad in as good condition and repair as it was at the time of taking possession; it being understood that the operator would comply in all things with the rulings and directions of the Public Service Commission. The operator further agreed that he would protect and save harmless the corporation from any liability for all claims for injury to property or persons, whether employees of operator or otherwise. The right is reserved by the corporation to revoke the permit upon one day's notice, it being "understood that the corporation expects to advertise and to sell its railroad, and that the permit and license hereby granted is temporary in character, subject to revocation at any time, and that the corporation receives no consideration, benefit or advantage from the operation of the railroad."

This permit was revoked by the corporation on December 19, 1921.

One Warren Ashworth, who had been for a time operating the railroad under arrangement with Doty, however, continued to operate until about the 1st of March, 1922. This with the assent of the Pacific Spruce Corporation, but to continue only while it was putting the road in condition for its own use as a logging road and plant utility.

It should be further stated that Doty, prior to the date of his permit and prior to February 25, 1919, was allowed to operate a stage line over the rails of said railroad, on the verbal statement of Reuben Hitchcock, Lieutenant Colonel, A. S., A. P., manager of government operations. However, it is apparent that, whatever the verbal arrangements were, the terms and conditions thereof have been incorporated in the written permit granted Doty by the Spruce Production Corporation.

McCamant & Thompson and Ralph H. King, all of Portland, Or., for plaintiff.

I. H. Van Winkle, Atty. Gen., and Wm. P. Ellis, Asst. Atty. Gen., for defendants.

WOLVERTON, District Judge (after stating the facts as above). Without question, the railroad was constructed by the general government, and for government purposes, to meet the exigencies of war. Primarily, it was designed as a utility, to subserve the government in the transportation of spruce timber for war purposes, and none other.

It will not be denied that, in the construction of such road, the government and its agencies were competent and legally entitled to exercise the right of eminent domain for procuring the necessary right of way for construction of the road and its accessories. Neither the government nor the United States Spruce Production Corporation ever operated the road except for construction purposes; the Armistice having been concluded before it could be utilized. Nor was it ever designed by the government that it should use the road other than as a logging road for war purposes. After the Armistice, the government adopted a policy of disposing of its spruce production war utilities, and it was not until the plaintiff corporation concluded to purchase the Toledo plant, railroad, and timberlands that the government was enabled to dispose of the same. In the meantime, work had ceased on the mill plant, nothing further had been done in the way of putting the railroad in condition for utilizing it for the purposes for which it was being constructed, and the entire project had been allowed to remain idle and without utilization for government purposes.

Upon the petition of citizens of Waldport and vicinity, the Spruce Production Corporation was induced to grant the Doty permit for operation of the railroad from Yaquina Bay to Waldport.

The single question involved by this inquiry is whether the Public Service Commission has jurisdiction over the plaintiff's railroad, to require of plaintiff the duty enjoined upon it by the order complained of. This depends upon whether, under the facts as disclosed in the controversy, plaintiff's railroad, extending from South Beach, on Yaquina Bay, to Waldport, is a common carrier.

Within the purview of the Public Service Commission Act, the term "railroad" embraces all corporations, companies, individuals, associations of individuals, etc., that may own or operate any railroad or part of a railroad "as a common carrier." But it is explicitly stated that the act shall "not apply to logging or other private railroads not doing business as common carriers." Section 5829, Oregon Laws. By subsequent sections provision is made for the incorporation of companies for operating logging roads, with power to construct, maintain, and

operate such roads for the transportation of logs or any other timber products, and it is declared, among other things, that such a company shall be deemed a quasi public company and common carrier, and shall have the right of "eminent domain," with the right "to appropriate and condemn lands and property for its use." Sections 6993, 6994, 6996. It is further provided that the company shall transport all timber products offered as its means of transportation are adapted to carry. Section 6995. So that, while such companies are denominated quasi public companies and common carriers by the act, it is obvious that they are to be common carriers only for the purposes of the requirements of the act, that is, that they shall transport all timber products offered, and that no obligation is imposed to carry freight or passengers generally for all persons desiring such service. Nor was it intended that the Public Service Commission should have jurisdiction to require such logging roads to carry persons and products other than as specified in the act, if it has any jurisdiction at all over such roads.

It is not essential to enter largely into the inquiry as to what utility is a common carrier. Such a carrier is defined by the Supreme Court of Oregon as "one who, by virtue of his calling and as a regular business, undertakes to transport persons or commodities from place to place, offering his services to all such as choose to employ him and pay his charges." Anderson v. Smith-Powers Logging Co., 71 Or. 276, 283, 139 Pac. 736, 739 (L. R. A. 1916B, 1089).

[1] It is not essential for constituting the utility a common carrier that it carry both passengers and freight, or that it carry all kinds of freight. Oswego, D. & R. Ry. Co. v. Cobb, 66 Or. 587, 593, 135 Pac. 181.

[2] It may be premised, in this connection, that the question whether the utility is a domestic or foreign entity, or whether the articles of incorporation authorize the construction and operation of a public service corporation or not, is not controlling in determining whether the utility is in fact a common carrier or public utility. The important thing is what it does. Terminal Taxicab Co. v. Kutz, 241 U. S. 252, 36 Sup. Ct. 583, 60 L. Ed. 984, Ann. Cas. 1916D, 765.

[3] Nor does the extent to which a railroad is in fact used determine whether it is a common carrier or not.

"It is the right," says Mr. Justice Day, in Tap Line Cases, 234 U. S. 1, 24, 34 Sup. Ct. 741, 746 (58 L. Ed. 1185) "of the public to use the road's facilities and to demand service of it rather than the extent of its business which is the real criterion determinative of its character."

It may be inquired, first, whether what was done and the use made of the railroad in carrying the mails, passengers, and freight, under Doty's permit, rendered the Spruce Production Corporation a common carrier; and, if it did, then second, whether the corporation could lawfully retrace its steps and resume its primary functions.

From a careful scrutiny of the Doty permit, it becomes quite apparent that the intendment was for temporary use of the road only, and not for a continuing use. It is specifically stated that the corporation expects to sell the road, and that the permit "is temporary in character, subject to revocation at any time." What is said as to the corpora-

tion's receiving no consideration is not very material except for determining the character of the permit. The fact is that the corporation received practically no consideration for granting the permit, no rental was charged or accepted, and the real and only purpose was, as is stated in the preamble to the agreement, that "the corporation is desirous of aiding the public." But, notwithstanding, the right was explicitly reserved for revoking the permit upon one day's notice, which, of course, when exercised, was designed to put an end absolutely to the privilege to be exercised by the lessee. The Spruce Production Corporation otherwise never used the road as a common carrier of freight and passengers.

Counsel for the Public Service Commission argues, with strong emphasis and persuasion, that what has been done in permitting the road to be used for the carriage of the mails, persons, and freight, is tantamount to a devotion of the railroad to a public use, and that, having once devoted it to such use, it cannot, against the protest of the users, divest itself of the duty of serving the general public.

[4] Property becomes clothed with a public interest when used in a manner that makes it of public consequence and concern, and that affects the community at large. When, therefore, one, in effect, sets apart his property to a use in which the public has an interest, it may be said that he, in effect, grants or devotes such use to the public, and, as a consequence, must submit to be controlled by the public for the common good, "to the extent of the interest he has thus created." Munn v. Illinois, 94 U. S. 113, 126 (24 L. Ed. 77).

The doctrine thus promulgated has been reaffirmed by the Supreme Court. Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247.

The state courts are in accord with the doctrine. When a corporation has constructed a railroad under the granted powers of the state, has exercised its right of eminent domain, and has invited and obtained subscriptions upon its implied promise to operate the road, and has commenced to operate under its granted powers, thus affording to the public an inducement to assume business relations with the railroad, it by such and equivalent acts does, in effect and in legal consequence, devote the road to public use, and it cannot be permitted to dissolve its relations with the public without the assent of the state. Gates v. Boston & N. Y. Air Line R. Co., 53 Conn. 333, 5 Atl. 695; State v. Dodge City, M. & T. R. Co., 53 Kan. 329, 36 Pac. 755, 24 L. R. A. 564.

This relates, of course, to the construction of railroads under the usual powers granted by the states and for general uses and purposes, which include that of common carrier among the rest.

[5] The present case is one, however, where the road was constructed, not through the exercise of the right of eminent domain under state authority, but under the authority of the general government, and for war purposes; and, further, the primary purpose was not to devote the road to general uses and purposes, including that of a carrier of persons and freight, but for government purposes alone, to subserve the exigencies of war. So that there can arise no implication that the government, in the construction of the road, devoted it to the uses of a common carrier.

We must therefore pass to the additional contention that the railroad was devoted to a public use by reason of having granted the Doty permit.

True, the use made of the road under the permit was public in character, but it was positively and specifically restricted as to time. The Supreme Court, in Nor. Pac. Ry. v. North Dakota, 236 U. S. 585, 595, 35 Sup. Ct. 429, 433 (59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1), has this to say:

"But, broad as is the power of regulation, the state does not enjoy the freedom of an owner. The fact that the property is devoted to a public use on certain terms does not justify the requirement that it shall be devoted to other public purposes, or to the same use on other terms, or the imposition of restrictions that are not reasonably concerned with the proper conduct of the business according to the undertaking which the carrier has expressly or impliedly assumed. If it has held itself out as a carrier of passengers only, it cannot be compelled to carry freight. As a carrier for hire, it cannot be required to carry persons or goods gratuitously. The case would not be altered by the assertion that the public interest demanded such carriage. The public interest cannot be invoked as a justification for demands which pass the limits of reasonable protection, and seek to impose upon the carrier and its property burdens that are not incident to its engagement."

But beyond this, the grantor "may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control." Munn v. Illinois, supra.

See, also, Brooks-Scanlon Co. v. R. R. Comm., 251 U. S. 396, 399, 40 Sup. Ct. 183, 64 L. Ed. 323.

Persuasively, the doctrine would seem to be of especial application where the use is, by express terms of the grant, made temporary in character.

The extension of the permit for use of the road by Ashworth, with the assent of plaintiff, was not more effective for devotion of the utility to public purposes than the grant itself.

I conclude, therefore, first, that the railroad which is the subject of controversy primarily was not devoted to public use; and, second, that the Doty permit was not a devotion of the road to public use, except temporarily, and that the Spruce Production Corporation was authorized and entitled to discontinue such use, and, that having been done, its successor, standing in its right, is not subject to the supervision of the Public Service Commission. The road is devoted to private purposes as a plant utility, and in no substantial sense may it be regarded as a public utility, devoted to public use.

The temporary injunction will be rendered permanent, and it is so ordered.