O'KEEFE, RECEIVER OF NEW ORLEANS, TEXAS & MEXICO RAILROAD COMPANY, *v.* UNITED STATES AND THE INTERSTATE COMMERCE COMMISSION.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

No. 516.   Argued December 15, 1915.—Decided February 21, 1916.

The Interstate Commerce Commission has jurisdiction to make an order requiring trunk line railways to reopen through routes and publish joint rates to interstate destinations with tap lines with which they have connection, and to prohibit the trunk lines from making to any tap line an allowance or division out of the joint rates in excess of a maximum prescribed.

The order in this case was not based on erroneous principles of law, nor did it exclude competitive conditions from consideration, but the Commission established maximum divisions for the purpose of preventing preferences, discriminations and rebates as methods of competition.

This court will presume that the Interstate Commerce Commission is expert in matters of rate regulation and able to draw inferences from the facts before it that are not necessarily obvious to others; and, in this case, *held* that from the record it appears that the tap line problem is so complex and the importance of a general rule for allowances to tap lines based on simple elements is so obvious, that this court will not hold that the adoption of a mileage basis for such allowances is sufficient to sustain a charge of arbitrary action.

A trunk line has no constitutional right to build up its business by doing acts that Congress has forbidden from considerations affecting public welfare; and an order of the Interstate Commerce Commission prescribing maximum rates, if otherwise legal, does not deprive a trunk line of its property without due process of law by denying it the right to compete for business in that manner.

*Quære,* whether a trunk line can object to an order of the Interstate Commerce Commission prescribing maximum allowances to connecting lines on the ground that the allowance is too small and, therefore, deprives it of the opportunity to pay a larger amount and obtain the business.

THE facts, which involve the validity of an order of the Interstate Commerce Commission establishing maximum allowances to and divisions of joint rates, with tap lines by trunk lines, are stated in the opinion.

*Mr. H. Generes Dufour* and *Mr. Walter F. Taylor*, with whom *Mr. Morgan M. Mann* was on the brief, for appellant.

*Mr. Assistant Attorney General Underwood* for the United States, *Mr. Joseph W. Folk* for the Interstate Commerce Commission.

MR. JUSTICE PITNEY delivered the opinion of the court.

This is an appeal from a decree dismissing a bill filed by appellant, as Receiver of the New Orleans, Texas and Mexico Railroad Company, against the United States and the Interstate Commerce Commission, praying the annulment of an order of the Commission, dated July 29, 1914, made in the *Tap Line Cases*, following the decision of this court reported in 234 U. S. 1. The order required certain trunk line railway companies, including the New Orleans, Texas & Mexico, to reopen through routes and publish joint rates to interstate destinations with certain tap lines, including Louisiana and Pacific Railway Company, with which appellant's road had and has a connection, and prohibited any of the line carriers from making to any of the tap lines an allowance or division out of the joint rates in excess of maximum amounts prescribed as follows:

"For switching a distance of 1 mile or less from the junction, $2 per car; over 1 mile and up to 3 miles from the junction, $3 per car; on shipments from points over 3 miles and not more than 6 miles from the junction 1½ cents per 100 pounds; over 6 miles and not more than 10 miles from the junction, 2 cents per 100 pounds; over 10 miles and not more than 20 miles from the junction,

2½ cents per 100 pounds; over 20 miles and not more than 30 miles from the junction, 3 cents per 100 pounds; over 30 miles and not more than 40 miles from the junction, 3½ cents per 100 pounds; over 40 miles from the junction, 4 cents per 100 pounds."

The following is an outline of the history of the case. After the supplemental report of the Commission in *Star Grain & Lumber Co.* v. *Atchison, Top. & Santa Fe Ry.*, 14 I. C. C. 364, 372; 17 I. C. C. 338, in which the making of allowances and divisions to tap lines for the traffic of proprietary mills was condemned, although no formal order was entered, the trunk lines, including the New Orleans, Texas & Mexico, filed cancellation of tariffs theretofore filed providing for joint rates with various tap lines, including the Louisiana & Pacific. Certain of the tap lines filed complaints with the Commission requesting that through routes and joint rates with trunk lines be enforced. The Commission thereupon investigated the tap line situation with reference to lumber operations in the States of Arkansas, Missouri, Louisiana, and Texas. Pending this investigation, the cancellation of joint rates was suspended from time to time. On April 23, 1912, the Commission filed its report, and on May 14, 1912, its supplemental report (23 I. C. C. 277, 549) and in orders dated May 14 and October 30, 1912, based upon these reports, it found that the tracks and equipment of the tap lines with respect to the industry of the proprietary lumber companies were plant facilities, and the service performed for the proprietary companies in moving logs to the mill and mill products to the trunk line was not a transportation service by a common carrier railroad, but a plant service by a plant facility, and that any allowance or division out of the rate on account thereof was unlawful and resulted in undue and unreasonable preferences and unjust discriminations; and the order of October 30 required the trunk lines, including the

New Orleans, Texas & Mexico, to desist and abstain from making any such allowance to any of the tap lines mentioned. Certain of the tap lines, including the Louisiana & Pacific, filed petitions in the Commerce Court to annul this order. The court granted this relief (209 Fed. Rep. 244), and its decision was affirmed by this court, 234 U. S. 1, the court holding that the Commission exceeded its authority in condemning the tap line railroads, when duly incorporated as common carriers under the state laws, as being a mere attempt to evade the commerce law and secure rebates and preferences for themselves. At the same time the court said (p. 28):

"It is doubtless true, as the Commission amply shows in its full report and supplemental report in these cases, that abuses exist in the conduct and practice of these lines and in their dealings with other carriers which have resulted in unfair advantages to the owners of some tap lines and (to) discriminations against the owners of others. Because we reach the conclusion that the tap lines involved in these appeals are common carriers, as well of proprietary as non-proprietary traffic, and as such entitled to participate in joint rates with other common carriers, that determination falls far short of deciding, indeed does not at all decide, that the division of such joint rates may be made at the will of the carriers involved and without any power of the Commission to control. That body has the authority and it is its duty to reach all unlawful discriminatory practices resulting in favoritism and unfair advantages to particular shippers or carriers. It is not only within its power, but the law makes it the duty of the Commission to make orders which shall nullify such practices resulting in rebating or preferences, whatever form they take and in whatsoever guise they may appear. If the divisions of joint rates are such as to amount to rebates or discriminations in favor of the owners of the tap lines because of their disproportionate amount in view of the

service rendered, it is within the province of the Commission to reduce the amount so that a tap line shall receive just compensation only for what it actually does."

After this decision, the Commission, after a rehearing and further argument but without taking further testimony, and upon the same record on which its orders of May 14 and October 30, 1912, had been entered, made further findings (31 I. C. C. 490), upon which was based the order of July 29, 1914, now under attack.

The New Orleans, Texas & Mexico Railroad Company operates, directly and through stock ownership of other companies, a system of railroad extending from New Orleans across the States of Louisiana and Texas. The Louisiana & Pacific Railway Company, incorporated under the laws of the State of Louisiana, owns and operates a tap line within that State, including approximately 80 miles of main and branch lines, its main line extending from De Ridder southerly to Lake Charles, approximately 45 miles, crossing and forming a junction with the main line of the New Orleans, Texas & Mexico at Fulton, which is about 25 miles from De Ridder and 19 miles from Lake Charles. The Louisiana & Pacific connects also with the following trunk lines: At De Ridder, with the Gulf, Colorado & Santa Fe and the Kansas City Southern; at Bon Ami (near De Ridder), with the Kansas City Southern; and at Lake Charles, with the Louisiana & Western (Southern Pacific Company), the Kansas City Southern, and the St. Louis, Iron Mountain & Southern. Located along the line of the Louisiana & Pacific are certain lumber mills, which are called proprietary mills because controlled by the same interests which own the stock of the Louisiana & Pacific. Some of these are at De Ridder, Bon Ami, and Longville, all of which points are north of Fulton, while one is at Gossport, near Lake Charles. At Bannister and Ragley, on the line of the Louisiana & Pacific, north of Fulton, there are non-proprietary mills.

In the year 1906, before the construction or definite location of the New Orleans, Texas & Mexico, an agreement was made between that company, then known by another name, on the one hand, and the Louisiana & Pacific and the various companies owning the proprietary mills, on the other, whereby the Louisiana & Pacific and the lumber companies agreed to give a substantial amount of their tonnage to the New Orleans, Texas & Mexico upon a division of the joint rates approximating 35%, not exceeding, however, in any case, $5\frac{1}{2}$ cents per hundred pounds. The lumber tonnage which, pursuant to this arrangement, the New Orleans, Texas & Mexico expected to receive and did, until the order of July 29, 1914, actually receive, was a great inducement for the company to locate its line through the territory where it is located. During the five fiscal years prior to July, 1914, its lumber tonnage amounted to 37.45% of its total gross, and of this the Louisiana & Pacific supplied approximately one-third, or about 13% of the total gross tonnage. Since the order of July 29, 1914, the New Orleans, Texas & Mexico has been deprived of practically all of this tonnage, which has been diverted to the other trunk lines because the Louisiana & Pacific, in order to gain as large a division of the joint rate as possible, moves its lumber tonnage from points near the northerly end of its line across the line of the New Orleans, Texas & Mexico, and delivers it to the trunk lines at the southerly end of its line; and also takes tonnage originating near the southerly end of its line, carries it across the line of the New Orleans, Texas & Mexico, and delivers it to trunk lines at or near its northerly terminus. It is said that the practical effect of the Commission's order results always to the disadvantage of the New Orleans, Texas & Mexico with respect to traffic originating upon the line of the Louisiana & Pacific, and that the disadvantage is in no case less than 1 cent per hundred pounds, or approximately $5 per

car. A single illustration will suffice. From the mill at Longville to the junction of the New Orleans, Texas & Mexico the distance is 8.2 miles, so that if the product of this mill were shipped over appellant's road, the Louisiana & Pacific would receive only 2 cents per hundred pounds, or $10 per car; whereas by carrying the product beyond Fulton to Lake Charles, and there delivering it to a trunk line, the Louisiana & Pacific receives a division of 3 cents per hundred; or by taking the Longville product to De Ridder, the Louisiana & Pacific likewise receives 3 cents per hundred. As the trunk lines all operate under a common blanket rate on lumber for this territory, the through rate is the same in all circumstances, and the proprietary mills route their shipments in such manner as to give to the Louisiana & Pacific the largest possible division, always to the disadvantage of the New Orleans, Texas & Mexico.

It is insisted by appellant that the Commission was without power to prescribe maximum divisions, as was done by the order of July 29, 1914, because no joint rate was fixed, either by the Commission or by the parties, and they had not been afforded an opportunity to agree in respect to the division. This is based upon the view that § 15 of the Commerce Act as amended (Act of June 18, 1910, c. 309, § 12, 36 Stat. 539, 551), contains only two provisions dealing expressly with the division of rates, the first being applicable where the carriers fail to agree among themselves upon the division, the other where the carriers have refused or neglected to establish through routes or joint rates voluntarily. Without stopping to consider whether the circumstances of this case bring it within either of these provisions, we deem it clear that to regard these only is to take too narrow a view of the scope of the section. The first part of the same section enacts—"That whenever . . . the commission shall be of opinion that any individual or joint rates

or charges whatsoever demanded, charged, or collected by any common carrier or carriers subject to the provisions of this Act for the transportation of . . . property . . . or that any individual or joint classifications, regulations, or practices whatsoever of such carrier or carriers . . . are unjust or unreasonable or. unjustly discriminatory, or unduly preferential or prejudicial or otherwise in violation of any of the provisions of this Act, the commission is hereby authorized and empowered to determine and prescribe what will. be the just and reasonable individual or joint rate or rates, charge or charges, to be thereafter observed in such case as the maximum to be charged, and what individual or joint classification, regulation, or practice is just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist," etc. And a later part of the same section (p. 553) prescribes: "If the owner of property transported under this Act .directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered or for the use .of the instrumentality so furnished, and fix the same by appropriate order," etc.

In the case in 234 U. S. 1, this court did not ignore, but fully recognized, the significance of the community of interest between the lumber company and the tap line. It was pointed out (p. 27) that timber and its manufactured products were exempted from the absolute prohibition of the Commodity Clause of the Hepburn Act (of June 29, 1906, ch. 3591, 34 Stat. 584, 585). But this was regarded as one of the circumstances rendering it important that the Commission should deal with the abuses

found to exist in the division of joint rates with the tap lines, not by abolishing them altogether, but by "reducing the amount so that a tap line shall receive just compensation only for what it actually does." So, in *Interstate Com. Comm.* v. *Diffenbaugh*, 222 U. S. 42, 46, the court said: "The act of Congress in terms contemplates that if the carrier receives services from an owner of property transported, or uses instrumentalities furnished by the latter, he shall pay for them. That is taken for granted in § 15; the only restriction being that he shall pay no more than is reasonable, and the only permissive element being that the Commission may determine the maximum." Again, in *Ellis* v. *Int. Com. Comm.*, 237 U. S. 434, 445, it was said: "The intervening corporation may be a means by which an owner of property transported indirectly renders the services in question, and in that event its charges are subject to the Commission by section 15."

We are clear that the Commission had jurisdiction to make the order of July 29, 1914.

Next it is insisted that the Commission applied erroneous principles of law, in that it excluded from consideration competitive conditions as an element in determining whether a division is just and reasonable or unlawfully discriminatory. The order is not open to this criticism. It not only takes competitive conditions into consideration, but establishes the maximum divisions for the very purpose of preventing preferences, discriminations, and rebates, as methods of competition.

It is insisted that there was no evidence before the Commission to sustain its finding to the effect that any allowance or division in excess of the limits prescribed would result in undue preference and unjust discrimination. This, of course, is to be tested by a consideration of the evidence that was before the Commission. The report and supplemental report of April 23 and May 14, and the orders of May 14 and October 30, 1912, and the

oral evidence and main exhibits before the Commission from the beginning of the tap line investigation to the making of the order last mentioned were offered in evidence. Appellant, however, has printed only a small part of the testimony, being that which especially relates to the Louisiana & Pacific Railway, its organization, ownership, manner and cost of construction, operating revenue and expenses, accumulated surplus, etc. But, besides these details as to this line, the Commission had before it, as its reports show, a mass of evidence relating to numerous other tap lines, operated under somewhat similar circumstances, including evidence as to the allowances actually made to them out of the joint rate. Evidence of what was allowed on these tap lines had a tendency to show what was reasonable and therefore permissible upon other tap lines, including the Louisiana & Pacific. It is said there was no evidence to enable the Commission to fix a just compensation to that line for a haul of a given number of miles as compared with the just compensation for a haul of a greater or lesser number of miles; no evidence as to terminal expenses, or cost of road haul, or the relation between these factors, or as to other elements which should be taken into account in fixing a division according to the length of haul. But the evidence showed that some limitation was called for, and, in general at least, furnished the materials upon which to base it. A tribunal such as the Interstate Commerce Commission, expert in matters of rate regulation, may be presumed to be able to draw inferences that are not obvious to others. Nor can it be said that the Commission's action was arbitrary because, while classifying all the service for distances up to 3 miles from junction as switching, and allowing for this a division of $2 and $3 per car, allowances for all distances above 3 miles are based upon mileage. It is admitted that distance is an element properly to be considered; but appellant insists

that terminal service, the origin of traffic, etc., are more important elements. This is an administrative question. The tap line problem is exceedingly complex, and the importance of a general rule based upon simple elements easily ascertained is obvious. We are not able to say that the adoption of the mileage basis is, under the circumstances, sufficient to sustain a charge of arbitrary action.

The final contention, which is that the Commission's order in effect deprives the New Orleans, Texas & Mexico of its property without due process of law, by denying to it the right to contract and compete for traffic originating on the line of the Louisiana & Pacific, is transparently unsound. The trunk line has no constitutional right to build up its business by paying bonuses or rebates that have been forbidden by act of Congress for considerations affecting the public welfare.

We are not to be understood as conceding that appellant is in a legal sense aggrieved by the action of the Commission in limiting the allowance to the tap line. The case is singular, in that neither this tap line nor any tap line is complaining that the allowance is too small; nor is any trunk line complaining that it is too great. The real basis of appellant's complaint, representing a trunk line carrier, is that the allowance to the tap line is too small. It is questionable whether it lies in the mouth of the line carrier to object on this ground.

We recognize the exceptional situation in which appellant's road is placed, and the hardship that results to it from the application of the order of July 29, 1914, to the traffic originating upon the line of the Louisiana & Pacific. After that order, the New Orleans, Texas & Mexico and the Louisiana & Pacific undertook to agree upon through routes and joint rates, with divisions not greater than those allowed by the Commission, but said to be equalized so as to enable the New Orleans, Texas & Mexico to com-

pete on equal terms with the other trunk lines. This agreement, so far as appears, has not been submitted to the Commission for its approval or disapproval, and we intimate no opinion upon the question whether that body ought to approve it.

*Decree affirmed.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.