CHESTNUT RIDGE RY. CO. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION, Intervener).

(District Court, D. New Jersey.   December 24, 1917.)

No. 1640.

1. COMMERCE ⬤→88 — INTERSTATE COMMERCE COMMISSION — SUFFICIENCY OF ORDER AND FINDINGS.

The Chestnut Ridge Railway Company owns a short line of road in Pennsylvania, with a shorter branch at one terminus. While a common carrier, the entire stock of the company is owned by a zinc company, which operates a plant at either end of the branch line, and the principal part of the traffic over such line consists of shipments to and from these plants. This road also connects at each of these points with a different through line. With one of these lines and its connections the company joined in establishing joint class rates to and from points west of Buffalo, of which it received a divisional share. On complaint of the connecting road at the other end of its branch line, the Interstate Commerce Commission found that its share of the joint rate on car load lots was unreasonable, in that it involved an unlawful concession to the zinc company, amounting to rebates on shipments to and from its plant at the other end of the branch line, and the Commission made an order that "no division should be paid on such traffic" in excess of a prescribed amount per car, making its report and findings a part of the order. *Held* that, taken together, this constituted a validly constructed order, affecting the Chestnut Ridge Company and properly supported by findings.

2. COMMERCE ⬤→85 — INTERSTATE COMMERCE COMMISSION — POWERS.

Under Interstate Commerce Act Feb 4, 1887, c. 104, §§ 3, 15, 24 Stat. 380, 384 (Comp. St. 1916, §§ 8565, 8583), the Interstate Commerce Commission has power to institute and pursue an investigation concerning practices represented to be unduly preferential or prejudicial, even

---

⬤→For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

though arising on a division of joint rates, and to stop such practices when found by an order that will prevent their continuance.

3. COMMERCE ⬠88—INTERSTATE COMMERCE COMMISSION—VALIDITY OF ORDER —MISTAKE OF LAW.

An order of the Interstate Commerce Commission, requiring a reduction in the divisional share of a railroad company in joint through class rates upon a finding that its share of such rates as established gave an undue preference to a shipper, amounting to rebates, *held* not invalid, as based on a mistake of law.

4. COMMERCE ⬠88—INTERSTATE COMMERCE COMMISSION—VALIDITY OF ORDER.

An order of the Interstate Commerce Commission, requiring a reduction in the divisional share of a railroad company in joint through class rates on carload lots, *held* not invalid, as arbitrarily made, because, while the established tariff fixed its share at a stated sum per 100 pounds, the order fixed a maximum sum per car, where its service rendered was almost entirely over a branch line only 1½ miles long.

5. COMMERCE ⬠88—INTERSTATE COMMERCE COMMISSION—VALIDITY OF ORDER —MISTAKE.

An order of the Interstate Commerce Commission, fixing the divisional share of joint through rates to which a railroad company was reasonably and lawfully entitled, by determining the cost of its service and adding thereto a percentage as profit, *held* invalid, as unsupported by the evidence, because of a mistake in the theory upon which it calculated an item of the cost of service.

6. COMMERCE ⬠96—INTERSTATE COMMERCE COMMISSION—REVIEW OF ORDER BY COURTS.

The courts have power and are required by the statute to set aside and enjoin the enforcement of an order of the Interstate Commerce Commission, based upon a finding which is unsupported by the evidence.

In Equity. Suit by the Chestnut Ridge Railway Company against the United States, in which the Interstate Commerce Commission intervened. Conditional decree for complainant.

William A. Glasgow, Jr., of Philadelphia, Pa., for complainant.

Joseph W. Folk, of St. Louis, Mo., and Albert L. Hopkins, of Washington, D. C., for Interstate Commerce Commission.

Charles F. Lynch, U. S. Atty., of Newark, N. J., for the United States.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges, and HAIGHT, District Judge.

WOOLLEY, Circuit Judge. The plaintiff brings this action by bill in equity, praying that an order of the Interstate Commerce Commission be annulled and its enforcement be enjoined. The matter in controversy before the Commission concerned the validity of a division of joint class rates agreed upon between the plaintiff and certain connecting carriers. The matter before us concerns the validity of the Commission's order, which, as it is alleged, was based upon a mistake of law and was arbitrarily made.

The plaintiff railway company (hereinafter called the Chestnut Ridge) operates a short industrial railroad. As its location, connections, and the general character of its business are fully set forth in reports made by the Commission in this and in a previous investigation (Chestnut Ridge Railway Class Rates Case, 41 Interst. Com.

---

⬠For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Com'n R. 62; Chestnut Ridge Railway Case, 37 Interst. Com. Com'n R. 558), we shall limit our statement to those facts which bear directly on the matter in hand.

The railroad of the Chestnut Ridge consists of two lines, a main line and a branch line. The main line extends from Kunkletown, Pa., to Palmerton East, Pa., a distance of about 10 miles, and does a miscellaneous business. The branch line, known as Palmerton Branch, extends from its connection with the main line at Palmerton East to Palmerton (conveniently called Palmerton West), a distance of 1.49 miles.

The stock of the Chestnut Ridge is owned by the New Jersey Zinc Company, a corporation of New Jersey, which also owns the stock of the New Jersey Zinc Company, a corporation of Pennsylvania (hereinafter called the Zinc Company). The latter company has two plants located on the Palmerton Branch; one, the East Plant, at Palmerton East; the other, the West Plant, at Palmerton West. While carrying some general traffic, the principal traffic of the Palmerton Branch consists of the Zinc Company's freight shipped to and from other roads, and moved to and from its two plants. This traffic comprises about 93 per cent. of the traffic of both lines.

The Chestnut Ridge has two trunk line connections, one at Palmerton East with the Lehigh and New England Railroad Company (hereinafter called the New England), which in turn connects at Portland with the Delaware, Lackawanna & Western Railroad Company (hereinafter called the Lackawanna); the other at Palmerton West with the Central Railroad Company of New Jersey (hereinafter called the Central). Both connecting systems carry traffic, by connections, to points west of Buffalo. This is the traffic which has given rise to this controversy.

The Chestnut Ridge, though privately owned and operated chiefly in the service of the Zinc Company, is a common carrier. Chestnut Ridge Railway Case, 37 Interst. Com. Com'n R. 558; The Tap Line Cases, 234 U. S. 1, 34 Sup. Ct. 741, 58 L. Ed. 1185. Being a common carrier it is required to establish through routes and make joint rates with its connecting carriers, and is entitled to share in a division of such rates. Chestnut Ridge Railway Class Rates Case, 41 Interst. Com. Com'n R. 62; Act to Regulate Commerce, §§ 1, 15 (Comp. St. 1916, §§ 8563, 8583). To that end the Chestnut Ridge began negotiations with the New England and Lackawanna looking toward the establishment of through routes and joint rates for the transportation of property *of all classes,* from and to points on its line to and from points beyond Buffalo, reached by the New England, Lackawanna and their connections. As traffic is of two kinds, the negotiations embraced joint class rates applicable to miscellaneous high grade traffic, and joint commodity rates applicable to special low grade commodities moving in heavy volume. These negotiations culminated in agreements respecting one class of traffic, namely, *class rates traffic.* By these agreements "joint class rates" were established on west bound traffic from points on the Chestnut Ridge to points west of Buffalo (Supplement 34 of Freight Tariff I. C. C. 9400), and between points on the Lackawanna and points on the Chestnut Ridge (Freight Tariff

I. C. C. 13099). Pursuant thereto and in obedience to the act in that regard, the Lackawanna, with the concurrence of the Chestnut Ridge, filed with the Interstate Commerce Commission and published these two tariffs.

Corresponding with the Lackawanna and Chestnut Ridge tariffs for joint class rates on traffic bound west of Buffalo, carriers west of Buffalo issued tariffs for the same joint class rates on traffic originating west of Buffalo and destined to points on the Chestnut Ridge (Record 16, 17, 58, 59).

These tariffs were subsequently considered as "applying on class traffic moving to and from points west of Buffalo to and from points on the Chestnut Ridge." They embraced traffic in carload lots and in less than carload lots and showed the share of each connecting carrier in the division. As division of joint class rates for less than carload lots was not excepted to or condemned by the Commission, it is not involved in this controversy. The share of the Chestnut Ridge in the division of joint class rates for carload lots varied with the rates as applied to class traffic of different kinds, and was about 20¢ per ton.

Upon the publication of these tariffs, the Central, conceiving the proposed joint class rates to be inimical to its interest, filed a protest with the Commission; whereupon the Commission suspended the tariffs and instituted an investigation concerning the lawfulness of the rates and of their division. The inauguration of these proceedings halted negotiations between the Chestnut Ridge, the New England and Lackawanna as to joint rates *on all other traffic*. It does not appear that the Chestnut Ridge and its connecting carriers have ever agreed upon or published joint *commodity* rates for traffic either originating on or destined to the Chestnut Ridge. Therefore, as we read the record, the investigation and the order of the Commission, as well as the bill for injunction filed in this action, extend to and concern only *joint class rates*. This is a matter vital to one phase of the case presently to be considered.

The protest of the Central grew out of the location of the two plants of the Zinc Company at opposite ends of the short Palmerton Branch (the Zinc Company and the railway company having a common owner) and out of the fact that each plant was served directly by one trunk line and indirectly by another. The Central contended that normally each line would receive the traffic of the plant with which it directly connects, but that the large share in the division of joint class rates allowed the Chestnut Ridge by carriers connecting with the East Plant, would induce the Chestnut Ridge to draw from the West Plant traffic, which, but for the division, would be delivered to the Central, and would cause the Chestnut Ridge to move this traffic over its mile and half branch road to its easterly end for delivery to the New England and Lackawanna, in order to obtain its share in the division of rates which those carriers offered. Stated briefly the Central contended that the share of the division allowed the Chestnut Ridge was so large that it involved rebates to the Zinc Company, its principal shipper, and amounted practically to a purchase by the New England and Lackawanna of its entire class rates traffic.

The Commission found that the joint class rates were not in themselves unreasonable, but that the share awarded the Chestnut Ridge in the division was unreasonable and unlawful in that it involved an unlawful concession to the Zinc Company amounting to rebates. It thereupon heard testimony concerning the general character and volume of all business of the Chestnut Ridge, ascertained the cost of the service to which the joint class rates in controversy were applicable, and added thereto a profit of 6 per cent. per annum. The cost and profit being reduced to figures, the Commission ordered that no division should be given the Chestnut Ridge on the traffic to which joint class rates were applicable in excess of a given figure per car, which was $3.25 per car on the Palmerton Branch, and $4.50 per car on the main line. Applying the principle of the Central's protest to its own situation at the westerly end of the Palmerton Branch, the Commission directed that it also should not allow the Chestnut Ridge any division on joint class traffic exceeding the prescribed amount per car. As the joint class rates were found not unreasonable, the Commission vacated its previous order suspending them.

The effect of the order reducing the share of the Chestnut Ridge in the divisions was to reduce materially its income from traffic to which the joint class rates were applicable. It accordingly brought this action by bill for injunction, attacking the validity of the order upon several grounds. The action is resisted by the United States and the Interstate Commerce Commission (hereinafter referred to as the Government) likewise upon several grounds.

We shall briefly dispose of two preliminary questions raised, leaving the substantial matters for discussion.

[1] The Government moves to dismiss the bill on the ground that the Commission made no order by which to enforce its finding, and the Chestnut Ridge moves for injunction on the ground, inter alia, that the Commission made no finding upon which to base its order. Taken together, these opposing motions present the anomalous contention that the record of the Commission's investigation shows a finding without an order and an order without a finding. Of course one or the other of these contentions must be wrong. We think both are wrong.

The Government maintains very earnestly that the Commission made a finding that the share of the Chestnut Ridge in the division of rates involved rebates to the Zinc Company, but contends that the Commission made no order based thereon directed to the Chestnut Ridge, and consequently there is no order for this court to annul or enjoin. American Sugar Refining Co. v. D., L. & W. R. R. Co., 207 Fed. 733, 740, 741, 125 C. C. A. 251. What the Commission did was to make a full report of its finding, and to conclude with the direction:

That "no division should be paid (the Chestnut Ridge) on such (joint class rates) traffic, regardless of its origin or destination, in excess of" given amounts per car according as movements are on the branch or main line, and that "these rates must not be divided, however, otherwise than in accordance with the conclusions herein expressed."

The Commission then, by express language, made its report a part of its order. Taken together, they constitute, to all intents and pur-

poses a validly constructed order to cease and desist from the unlawful practices found. We therefore deny the motion to dismiss.

As an injunctive remedy cannot be invoked against an order never made, the Chestnut Ridge insists just as earnestly that the Commission made an order, but maintains that it made no finding upon which to base it, and therefore, the order is invalid. As the Commission incorporated in its order its "report containing its findings of fact and conclusions thereon," and as this report shows very clearly and very certainly a finding that the share of the Chestnut Ridge in the division of rates was unlawful because large enough to make a discrimination in the form of rebates to the shipper, which was virtually the owner of the line, and to operate with unfair advantage to one carrier and undue prejudice to another, we think there is no merit in this position.

[2] Preliminarily to a discussion of the substantial questions raised in this case, we may say very briefly that there can be no question of the power of the Interstate Commerce Commission, as conferred by the Act to Regulate Commerce, sections 3 and 15 (Comp. St. 1916, §§ 8565, 8583), to institute and pursue an investigation concerning practices represented to be unduly preferential or prejudicial, even though arising on a division of joint rates. Nor can there be a question, since The Tap Line Cases, 234 U. S. 1, 34 Sup. Ct. 741, 58 L. Ed. 1185, O'Keefe v. United States, 240 U. S. 294, 36 Sup. Ct. 313, 60 L. Ed. 651, and United States v. Butler County Railroad Co., 234 U. S. 29, 34 Sup. Ct. 748, 58 L. Ed. 1196, of the power of the Commission to stop such practices, when found, by an order that will prevent their continuance. In this regard the Supreme Court said in The Tap Line Cases, and again in the O'Keefe Case, that:

"It is doubtless true, as the Commission amply shows in its full report and supplemental report in these cases, that abuses exist in the conduct and practice of these lines and in their dealings with other carriers which have resulted in unfair advantages to the owners of some tap lines and to discriminations against the owners of others. Because we reach the conclusion that the tap lines involved in these appeals are common carriers, as well of proprietary as nonproprietary traffic, and as such entitled to participate in joint rates with other common carriers that determination falls far short of deciding, indeed does not at all decide, that the division of such joint rates may be made at the will of the carriers involved and without any power of the Commission to control. That body has the authority and it is its duty to reach all unlawful discriminatory practices resulting in favoritism and unfair advantages to particular shippers or carriers. It is not only within its power, but the law makes it the duty of the Commission to make orders which shall nullify such practices resulting in rebating or preferences, whatever form they take and in whatsoever guise they may appear. If the divisions of joint rates are such as to amount to rebates or discriminations in favor of the owners of the tap lines because of their disproportionate amount in view of the service rendered, it is within the province of the Commission to reduce the amount so that a tap line shall receive just compensation only for what it actually does."

The question in this case is: Whether in pursuing its investigation and in making an order intended to end the preferential and prejudicial practices found (under authority of the statute as construed in The Tap Line Cases) the Commission exceeded its power in two of the ways declared by the Supreme Court in Interstate Commerce Com-

mission v. Union Pacific R. R., 222 U. S. 541–547, 32 Sup. Ct. 108, 56 L. Ed. 308, to be beyond its power, in that (1) the Commission based its order upon a mistake of law, and (2) it acted arbitrarily in that it fixed divisions of joint rates contrary to evidence or without evidence to support it.

*Mistake of Law.*

[3] The plaintiff's contention that the Commission's order was based upon a mistake of law is presented in two aspects. The plaintiff first contends that the Commission computed an *average revenue* which it deemed to be fair for the railroad's *entire* traffic, and then, instead of fixing rates which would yield that average, forbade *all* divisions in excess of that average, without regard to the commodity carried.

We read the record differently. The Commission's investigation was directed to rebates alleged to be concealed in the division of rates to the Chestnut Ridge for one kind of service, namely, joint class rates service. If rebates were there, they were to be found in the profits to the Chestnut Ridge for that service. Profits in that service could be ascertained only after the cost of that service had been determined. Therefore, the Commission addressed itself to the *cost* of *one* kind of service, namely, joint *class* rates service, and not to the cost of service in moving traffic of *all* kinds. Nor did the Commission address its inquiry to revenue, average or otherwise, derived from the carrier's traffic, except to ascertain the element of cost for the service under investigation, which of course was embraced in that revenue. In ascertaining the cost of this particular service, the Commission had to hear evidence as to the general cost of operation and transportation, involving cost factors common to service of all kinds. These costs being commingled in the carrier's bookkeeping of revenues received and expended, the Commission inquired into them in order to divide and separate the cost of service of different kinds and then to select the cost items of joint class rates service and add them to the cost of that service. Assuming for the moment that the Commission's calculations were correctly made, both in theory and computation, the result was not a *revenue figure,* "which (the Commission) deemed to be fair for the railroad's *entire* traffic, and beyond which it could not go in *any* traffic," but was a figure covering simply the *cost* of one kind of service and a profit on that service, which together would be high enough to be remunerative and low enough to prevent further unlawful practices, leaving the carrier to make from other rates not investigated or considered, such as interstate joint commodity rates, intrastate class and commodity rates, and passenger rates, whatever they would earn. In doing this we do not find that the Commission acted under a mistaken conception of the law.

A further mistake of law upon which the Chestnut Ridge contends the Commission based its order, is found in the factor of profit which the Commission added to the ascertained cost of joint class rates service, in prescribing a lawful division. It maintains that the Commission fixed the profit on the theory, "That the mere earning of an industrial

railroad of more than six per cent. on its investment is, in itself, and without more, unlawful."

If in determining a lawful division involving a profit, the Commission acted upon such theory, there is substance in the plaintiff's contention. Certainly the Commission did not assert such a proposition in words. Let us see whether, by its acts, it enforced such a proposition in effect.

In the first place, the investigation of the Commission did not extend to the *general* earnings of the carrier on its varied traffic. With respect to such, no protest was filed, investigation instituted or order made. The Commission was not concerned even with the Chestnut Ridge's earnings on the particular class rates involved in the investigation, except to inquire and find whether they contained and concealed preferences and prejudices denounced by the law. It therefore began its investigation, not with the object of determining whether the profits of the carrier were unlawful because more than six per cent., but with the one object of determining whether the division of the joint class rates in question was unlawful because large enough to include rebates. In order to determine this, the Commission had to do several things. It had to do what the Supreme Court in Pennsylvania R. R. Co. v. International Coal Co., 230 U. S. 180, 196, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315, said it should do, namely, make "a comparison of rate with service." In comparing the rates with the service it had to determine the value of the service in order to determine whether the rates charged for the service were beyond its value and involved rebates. It had to ascertain, therefore, the cost of the service, which it did in a way to be considered later. Having ascertained the cost of the service, the Commission sought to determine a profit on the service, which because of its several bearings comprises several elements. It was necessary that this profit should be fixed at a figure which would prevent further rebate practices and yet be not confiscatory, and, taken together with the cost, should be a figure, which, while remunerative, should not be so high as to establish a preference in its own favor, directly or indirectly, or a preference to one and a discrimination against the other of the trunk lines competing for its traffic. The Commission decided upon a profit of six per cent. over and above the total cost of the service. This percentage of profit was not fixed upon the theory that a profit beyond six per cent. is, "in itself, and without more," unlawful, but was fixed because "more" was considered in connection with a proper profit, namely, the character of the service on which the profit was to be earned, the cost of that service, the geographical and commercial location of the road, the volume and character of its business, its size, the common ownership of the road and traffic, and especially the line of profit above which rebates occur and below which they stop. Having ascertained all these factors, and having applied them to the practices under investigation, we cannot say that the Commission was guided by a mistaken notion of the law and acted arbitrarily in allowing six per cent. profit on divisions which it established to prevent a continuance of the preferences and prejudices which it found existed in previous divisions.

*Arbitrary Fixation of Divisions.*

[4] The joint class rates under investigation were so much per hundred pounds in carload lots, and the division agreed upon was for given proportions of the hundred pound rates. The Commission in its "order prescribing the just and reasonable proportion of such joint rate to be received by each carrier party thereto," under authority of the act, prescribed a flat sum *per car* as the proportion of the Chestnut Ridge in the division and left the other carriers to proportions *per hundred pounds.* This the Chestnut Ridge claims to be an arbitrary, and, therefore, an unlawful exercise of power. We are not impressed with this contention. The division of a joint rate per car, instead of per pounds, is none the less a division of the rate. The character of the service, being a matter bearing directly upon the rate, bears equally upon a division of the rate. The service involved was almost altogether over a branch 1.49 miles in length. It is conceivable that the Commission viewed this railroad as little more than a switch, and the service performed on it as little more than a switching service, for which charges are ordinarily allowed and paid per car and not per pound. While under this arrangement it is true, as complained by the Chestnut Ridge, that it gets no more for handling a car of 30,000 lbs. than for handling a car of 10,000 lbs., it is equally true that it gets as much for handling a car of the lighter load as it gets for handling a car of the heavier, as in ordinary switching service.

We do not think that the division of the joint rates in question, made on a per car basis, was arbitrarily made and was for that reason unlawful.

[5] The remaining ground of the contention that the order of the Commission is invalid because arbitrarily made, is an alleged mistake of method in calculating an item of cost of class rates service, known as per diem charges.

In approaching this phase of the case, we shall state again what we have found necessary to say several times in order that the true issue in this controversy may constantly be kept in mind. The Commission's investigation had to do with joint *class* rates; it had nothing to do with joint *commodity* rates. Primarily, therefore, its inquiry was directed to the *cost* of joint class rates service; it was at no time directed to the cost of joint commodity rates service. True, it touched the cost of commodity rates service when some cost item of that service was combined or commingled with a like cost item of class rates service in the accounts of the railroad, as cost of operation, maintenance of highway, depreciation, etc. But it dealt with such double accounts only to divide and separate the items of cost of the two services, and then laying aside costs chargeable to commodity service, it charged the ascertained items of cost on class rate service to that service.

Thus the Commission proceeded, until it ascertained what it thought was the total cost of joint class rates service. To that it added a profit. The sum was an amount which the Commission awarded the Chestnut Ridge as its share in the division of joint class rates, and was such a figure as the Commission conceived would prevent the continuance of its unlawful practices.

In reaching the total cost of joint class rate service, the Commission was required to deal with a factor of cost known as "per diem charges." This is a cost common to both commodity service and class rate service in the sense that it is present in both, but it is present in markedly different proportions, due to a difference in the character of the traffic creating such charges.

The Chestnut Ridge, though a common carrier, has no cars of its own. It carries on its business, therefore, in cars of other carriers. For these it makes payments in the nature of rentals; but these payments are fixed primarily by a flexible rule, and ultimately by a circumstance to be determined after foreign cars have arrived upon its road. This rule and determining circumstance are controlled by the character of the traffic transported.

The freight traffic of the Chestnut Ridge is of two kinds; traffic of low grade, moving in heavy volume, easily discharged, and involving no delay in returning cars, for which relatively low "commodity rates" are charged; and traffic of higher grade, consisting of miscellaneous articles requiring time to discharge and consequently involving delay to cars, for which higher "class rates" are charged. As the Chestnut Ridge moves its traffic of both kinds in cars of other roads, there is entered against each car so used, without regard to the character of the traffic or the rates, an initial charge of 45¢ per day. This is the rule, and items so charged are called "per diem charges."

The rule, however, is relaxed, if a car can be unloaded and returned on the first day of its use. On such a car no per diem is charged. Now a great number of cars moving in and out of the Chestnut Ridge are hopper cars carrying commodity traffic, and being capable of speedy discharge and return in one day, escape per diem charges altogether. Some cars carrying class rates traffic likewise move in and out in one day and escape the initial per diem charge. But class rates traffic is of a character that usually involves slow discharge and consequent delay, running sometimes into several days. It thus appears that while per diem charges are cost factors in both class rates service and commodity rates service, the former is burdened with a cost from which the latter is largely exempt because of the difference in the character of traffic moved in the two services. As the per diem item of cost is considerable or inconsiderable according to the service to which it is chargeable, the method by which the Commission should compute it, being important, became the subject of much discussion and confusion at the hearing.

What the Commission did was to divide the total per diem charges paid on both commodity and class rate traffic for a given period by the total number of cars engaged in *both* traffics, including those which did not pay as well as those which did pay per diem charges, resulting in a quotient of 70¢ per diem charges per car, and charged that sum as a cost of joint *class* rate service. The Commission's method of calculation was at variance with the method recommended by its Examiner, who, when taking testimony, conceived that the proper way to ascertain per diem charges as a cost per car of joint class rates service would be to divide the total per diem charges paid upon cars engaged in *both* traffics in a given period by the total number of cars in both

traffics *paying* per diem in that period (i. e. excluding from the divisor all cars which paid *no* per diem). By this calculation the quotient would be $1.21 per diem charge per car. The Chestnut Ridge finds itself in accord with the Examiner and contends that his method is the correct one. We believe both methods to be wrong.

We shall first discuss the method for which the railroad contends. *Some* cars in *class* rates service *do not pay* per diem charges because they are discharged within the first day; *others do pay* per diem charges because not discharged until after the first day. Class *rates* apply to *all* class cars. They apply alike to those not paying as well as to those paying per diem charges. The inquiry of the Commission, however, was directed to the per diem cost chargeable to *all* cars moving traffic for which joint class rates are collected. This requires, as we see it, the ascertainment of an *average* per diem cost chargeable to *each* car engaged in the traffic to which joint class rates per car are applicable. And just here is the fault of the plaintiff's contention.

If the Commission had attempted, as the plaintiff insists it should have done, to ascertain the per diem cost of *class rates service per car* by dividing "the total per diem charges paid for the chosen year (which include charges paid upon both commodity and class rates traffic) by the number of cars *paying* per diem in that year (which includes cars moving both commodity and class rates traffic) i. e., excluding from the divisor cars (engaged in both commodity and class rates traffic) which paid *no* per diem," the Commission would have had in its problem a dividend, which included *commodity* per diem costs, into which it was not inquiring, a divisor, which included a variant *commodity* per diem cost factor, because different from and admittedly less than the per diem cost factor of class rates traffic, and a quotient, which could not conceivably have shown per diem cost per car on *class* rates service *alone*. If, however, we segregate the total per diem charges paid on commodity traffic and the total number of commodity traffic cars paying per diem charges, and eliminate them from the calculation, and apply the plaintiff's method to class rates traffic alone by dividing the total per diem charges paid on class rates traffic by the number of class rate cars *paying per diem*, i. e. excluding from the divisor, as before, class cars which paid *no* per diem, we have a quotient which is as clearly wrong as it is profitable to the railroad. Such a quotient would give only the per diem cost on class rate cars *paying* per diem charges and would not give a per diem factor of cost on class rate cars *not* paying per diem charges. Yet, class *rates* are the same on *all* class cars and apply equally to those which *do not pay* as to those which do pay per diem charges. When the per diem cost for class rate cars is based upon a calculation that includes only the cars which pay it, then, when class rates are applied to and collected from cars which do not pay it, what was an item of cost on the cars paying it becomes, and is transformed into an item of profit on the cars not paying it. With class *rates* at a fixed and uniform *level*, any variation of *cost* of class rates service of two kinds (that paying and that not paying per diem charges) results in a variation of profit. When the level of *cost* of the *whole* class rates service is fixed by including a cost item *paid by only a fraction* of it, the remaining fraction, which is charged

248 F.—51

with but escapes payment of that cost item, yields a profit in the exact amount of the cost item so charged and not paid. This, manifestly, should not be.

It is clear that the calculation which the Commission made, and upon which it based its order, is also wrong, for it places the per diem charge per car for class rates service as certainly below the proper cost per car for such service as the railroad, by its calculation, would place it above the proper cost. By its method the Commission "computed the per diem cost (per car) of the *class* traffic by dividing the total per diem charges (of both commodity and class rates service) by the total number of cars handled" in *both* commodity and class rates traffic, including cars which paid and cars which did not pay per diem charges. Keeping in mind that the purpose of the calculation was to find out the per diem cost per car on *class* rate traffic, it is quite evident that a calculation that has for its dividend per diem charges paid by *two* kinds of traffic in *different* proportions, and has for its divisor the whole number of cars used in *two* kinds of traffic, cannot produce a quotient which will give a correct cost factor of one kind of traffic only. We are therefore of opinion that the Commission based its order upon a mistake in calculation. Has this court power to declare invalid the order based upon that mistake?

[6] We fully recognize that findings by the Interstate Commerce Commission of what are reasonable rates and of what are lawful divisions of joint rates are administrative matters peculiarly within the jurisdiction of the Commission and are not reviewable by courts of law. The validity and finality of such findings, however, depend upon the presence of facts upon which they are based. The Supreme Court has declared that:

"A finding without evidence is beyond the power of the Commission. An order based thereon is contrary to law and must, in the language of the statute, 'be set aside by a court of competent jurisdiction.' 36 Stat. 551." Pennsylvania R. R. Co. v. International Coal Co., 230 U. S. 184, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315; Interstate Commerce Commission v. Louisville R. R. Co., 227 U. S. 88, 91, 33 Sup. Ct. 185, 57 L. Ed. 431; Interstate Commerce Commission v. Delaware, etc., Ry. Co., 220 U. S. 235, 251, 31 Sup. Ct. 392, 55 L. Ed. 448; Florida East Coast Ry. Co. v. United States, 234 U. S. 167, 185, 34 Sup. Ct. 867, 58 L. Ed. 1267.

In applying this law to the case, we shall not for a moment assume the administrative function of the Commission and determine what is a proper division of the rates in controversy. We shall confine ourselves to our judicial function of determining whether the Commission's cost finding is contrary to evidence or is without evidence to support it, and whether, accordingly, the Commission's order based upon its finding is invalid. We find that the Commission made a mistake in the theory of its calculation for the reasons we have shown. We also find, that while there is enough evidence in the record to indicate the correct theory by which the result desired can be calculated, there is not in the record the requisite evidence with which to make a proper calculation.

There was no evidence produced showing the total per diem charges paid exclusively in class rates service for a given period and showing

also the total number of cars engaged in that service for the same period, upon which to base a calculation of per diem charges per car in joint class rates service. When both these numerals are ascertained by the production of proper evidence, then a division of the total per diem charges paid on joint class rates traffic by the number of cars engaged *in that traffic* (including those which do *not* pay as well as those which do pay per diem charges) will produce a quotient which will show the average and therefore the proper per diem per car chargeable as a factor of cost to *all* cars moving joint class rates traffic for which joint class rates are equally charged and collected. We are of opinion that the order of the Commission is invalid and should be annulled.

This Court does not assume that it is vested with power to supervise the actions of the Interstate Commerce Commission, but it proposes, as a practical consideration, postponing the entry of a decree in this case for a period of ninety days from the filing of this opinion, to afford the Commission an opportunity, should it desire it, to rectify its mistake by such action as may be appropriate. If the Commission shall have taken no action within the period indicated, a decree will be entered upon the expiration of the period, annulling the order and enjoining its enforcement, leaving the opposing parties to their rights as of that date.