**NATIONAL TUBE CO. et al. v. UNITED STATES et al.**

(District Court, N. D. Ohio, E. D. December 13, 1918.)

No. 456.

Commerce ⬅96—**Enforcement of cease and desist order of commission relating to switching charges restrained.**

   A preliminary injunction granted, restraining enforcement of an order of the Interstate Commerce Commission directing trunk line carriers to cease and desist from making allowances to a terminal railroad company, for switching services, where such order was made on a petition of the terminal company for reparation for failure to make such allowances in a past period during which they had been discontinued, though subsequently resumed, which petition did not tender any issue as to the future practice, and petitioner was not advised that such issue was to be considered, and where the only evidence as to existing conditions was the record in a proceeding several years before.

In Equity. Suit by the National Tube Company and others against the United States and others. On motion for preliminary injunction, suspending order of Interstate Commerce Commission. Granted as to part of the order.

Suit under Commerce Court Act (36 Stat. 539) and Urgent Deficiencies Act October 22, 1913 (38 Stat. 219), to enjoin, set aside, annul, or suspend order of Interstate Commerce Commission, July 11, 1918 (50 Interst. Com. Com'n R. 489), which directed trunk line carriers to

cease and desist from the practice of making allowances to The Lake Terminal Railroad Company for switching services rendered by the latter in the plant of the National Tube Company at Lorain, Ohio, the entire capital stock of which is owned by or in the interest of United States Steel Corporation. Hearing on application for temporary injunction. Injunction issued, suspending so much of the order complained of as relates to future allowances.

Alton C. Dustin, of Cleveland, Ohio, and Charles S. Belsterling, of New York City (Charles MacVeagh, of New York City, C. A. Severance, of St. Paul, Minn., Alton C. Dustin, of Cleveland, Ohio, and Charles S. Belsterling, of New York City, of counsel), for plaintiffs.

Blackburn Esterline, Sp. Asst. Atty. Gen., of Washington, D. C. (Edwin S. Wertz, U. S. Atty., of Cleveland, Ohio, on the brief), for the United States.

Charles W. Needham, of Washington, D. C. (P. J. Farrell, of Washington, D. C., on the brief), for defendant Interstate Commerce Commission.

S. H. West, of Cleveland, Ohio, for defendant New York Cent. R. Co.

William Ainsworth Parker, of Baltimore, Md., and Morrison R. Waite, of Cincinnati, Ohio, for defendant Baltimore & O. R. Co.

H. T. Ballard, of Cleveland, Ohio, for defendant New York, C. & St. L. R. Co.

Squire, Sanders & Dempsey and R. F. Denison, all of Cleveland, Ohio, for defendants Wheeling & L. E. R. Co., Lorain & W. V. R. Co., and Lorain, A. & S. R. Co.

Before KNAPPEN, Circuit Judge, and KILLITS and WESTENHAVER, District Judges.

PER CURIAM. Application by plaintiffs under section 998, U. S. Comp. Stat., for temporary injunction in suit brought under sections 992 and 997 of that compilation, to set aside an order of the Interstate Commerce Commission requiring the trunk line defendants to desist from making allowances or divisions to the Lake Terminal Railroad Company on account of certain services to the National Tube Company and the Carnegie Steel Company. Each of the three plaintiffs is a subsidiary of the United States Steel Corporation.

The Tube Company's plant is located at Lorain, Ohio, adjoining the Black river on the north. It consists of several hundred acres of land (inclosed by a fence), on which are located tube, rolling, rail, and pipe mills, blast and open hearth furnaces, galvanizing plants, docks and dockyards, brick and storage yards. It employs several thousand men. Its dock on Black river receives large shipments of iron ore from the upper lake region, transported principally by vessels owned by other subsidiaries of the United States Steel Corporation. The Tube Company has a narrow-gauge railroad system within its plant inclosure for purely inter-mill movements. This the Tube Company alone operates. It also owns and operates generally several miles of standard-gauge track, within the plant enclosure, likewise for inter-plant movements.

Its in-bound railroad traffic consists principally of coal, coke, and limestone; its out-bound traffic principally of its own steel and other products. The trunk line railroads do not enter the Tube Company's plant. They maintain interchange tracks with the Lake Terminal Railway—the Baltimore & Ohio Railroad at a little distance from the west end of the plant; the New York Central, the Nickel Plate, and the Lake Erie & Western at a short distance east of the plant.

The Lake Terminal was originally constructed as a plant facility of the Tube Company's predecessor; later it was incorporated as a railroad company under the laws of Ohio. It is regulated and taxed as a common carrier by the United States and the state of Ohio. It owns and operates upwards of 12 miles of standard-gauge main track; its east and west terminal being at the trunk line interchange tracks both east and west of the Tube Company's plant. Its line extends entirely through the plant (reaching the docks on Black river), in which plant inclosure it has upwards of 20 miles of side tracks and switches which serve the various mills. It seems to own the right of way of its own road, nearly all of which is within the Tube Company's plant inclosure. Its equipment consists of 20 locomotives, 346 freight cars, and other items. The great bulk of its business consists in taking from or delivering to the trunk line railroads, at their interchange tracks, carload freight shipped or received by the Tube Company. The inbound freight is hauled in train loads to the breaking-up yards within the plant inclosure, where the cars are distributed by the Terminal Company to the various plants. In transferring ore from the dock, and in other inter-plant movements, the Terminal Railroad uses the Tube Company's standard-gauge tracks, for which service it is said to receive from the Tube Company regular tariff charges.

The Carnegie Company has no mill at Lorain. The service which the Lake Terminal renders it consists in the hauling of iron ore from the Tube Company's docks on Black river, delivered there principally by subsidiary agents of the United States Steel Corporation, through the Tube Company's plant, and thence to the trunk line interchange tracks. At the time of the hearing of the Industrial Railways Case, the Lake Terminal service to others than the Tube Company and the Carnegie Company amounted to but a fraction of 1 per cent. of its total business.

Previous to the decision of the Industrial Railways Case, 29 Interst. Com. Com'n R. 212, January 20, 1914, the trunk line roads had absorbed the charges of the Lake Terminal Company for the movement of freight between the interchange tracks and the various mills of the Tube Company's plant. The Commission having held in that case (No. 4181) that the Lake Terminal Railroad was a mere plant facility of the Tube Company, and that it performed no service of transportation justifying an allowance out of the line-haul rate, the trunk line roads, on April 1, 1914, discontinued the absorbing of the Lake Terminal's charges. Following the decision of the Tap Line Cases, 234 U. S. 1, 34 Sup. Ct. 741, 58 L. Ed. 1185, the Commission made a supplemental report in the Industrial Railways Case, 32 Interst. Com. Com'n R. 129, 132, November 2, 1914, modifying to some extent its former report and

permitting the carriers to make allowances to industrial roads where clearly lawful and proper, the Commission undertaking, at the earliest opportunity thereafter, to inquire into those which seemed improper. The Lake Terminal Railway was not specifically mentioned in this report. On April 14, 1915, the trunk lines resumed the practice of absorbing the Terminal Company's rates, but on a slightly modified basis.

In the Second Industrial Railways Case, 34 Interst. Com. Com'n R. 596, July 1, 1915, the principles and limitations under which arrangements might be made between trunk lines and industrial roads for interchange of transportation were defined, and in dismissing the proceedings on that docket without prejudice, it was stated that—

"The Commission will look to the trunk lines to reframe their tariffs and file with this Commission whatever arrangements they may make with the industrial lines here in question in the light of this report."

In January, 1916, the Tube Company and the Carnegie Company, respectively, brought proceedings before the Commission against the Lake Terminal Company and the various trunk lines involved for reparation on account of the moneys paid to the Lake Terminal during the period from April 1, 1914, to April 14, 1915, on account of charges for services before and since that period absorbed by the trunk lines, and which plaintiffs claim are limited to purely delivery charges, under the regular tariffs. These petitions were consolidated for hearing with petitions of similar character by other shippers against trunk line carriers. The Commission, by a majority report, denied the petitions of the Tube Company and the Carnegie Company for reparation, on the grounds (a) that the services rendered by the Lake Terminal to the petitioners were merely of a plant or proprietary nature and were not transportation services, that is to say, that the duty of transportation by the trunk line carriers began or ended, as the case might be, at the interchange tracks; and (b) that any allowance by the line carriers out of the line rates, on account of such plant service, is unlawful, as resulting in undue or unnecessary preferences and unjust discriminations. The order (made June 11, 1918) also commanded the trunk line defendants to refrain for two years from making allowances or divisions on account of the Terminal Railway's services. 50 Interst. Com. Com'n R. 489.

Plaintiffs concede, upon the authority of Proctor & Gamble v. United States, 225 U. S. 282, 32 Sup. Ct. 761, 56 L. Ed. 1091, that so much of the Commission's order as denied reparation is not open to review. The sole meritorious question presented thus relates to the validity of the order so far as it relates to the future.

The first and second defenses presented by the answer of the United States (not argued in brief of either the Commission or the United States) seem to us to require no present consideration.

On the trial of the reparation proceeding the record in the Industrial Railways Case (No. 4181) was received, at least for the purpose of that proceeding. The majority of the Commission regarded it as part of the record for all purposes, and treated the issues as broad enough to embrace the question of future allowances by the trunk line carriers.

In addition to the defense that the Commission's action was wrong, unsupported by the record and wholly invalid, plaintiffs insist that the record in the Industrial Railways Case was introduced only for the purpose of the reparation proceeding proper; that the issues in that proceeding were never broadened so as to embrace the question of future allowances; that until the "cease and desist" order was made they had no notice or understanding that such question was in issue or was to be determined; that unless the record was properly before the Commission for the full purpose stated, there was no evidence whatever to support the order forbidding future allowances.

There is much to be said for the view that a denial of reparation in the form of terminal allowances for the period in question, because merely a plant service and not a service of transportation, required the forbidding of future allowances of the same kind, assuming that no change in the situation had meanwhile occurred, and that plaintiffs understood that the issue was as broad as here claimed by the defendants. The Commission had power to institute, on its own motion, proceedings for that purpose, and, as already stated, it had in its supplemental report in the Industrial Railways Case, supra, announced its intention to inquire at the earliest opportunity into allowances which seemed improper.

The proceedings before the Commission may be more or less summary, and it was doubtless competent to try out in the reparation proceeding the question of future allowances without a formal framing of issue to that effect, provided all parties concerned so understood. It was entirely natural that the Commission, having decided what it regarded as the controlling principle, should also wish to dispose, at the same time, of the question of future allowances. Indeed, its answer in the instant proceeding states in substance that it made the "cease and desist" order, because in that way only could its general finding that the Terminal Company was entitled to no division of rates be reviewed, citing the attempt of the Steel Corporation, in the Industrial Railways Case, to compel an affirmative order, for the purpose of enabling review. But we are not satisfied that plaintiffs understood, or had reason to understand, that the question of future allowances was to be determined in the reparation proceeding.

The only occurrence on the hearing lending color to that view is this: On the hearing counsel representing the trunk line companies stated that the "history of the Industrial Railways situation in No. 4181 will constitute the defense," and counsel representing a shipper (not one of the plaintiffs here) said he took it that "the record in 4181 is in this case for the purpose of this case." Treating this colloquy as binding all persons (in the absence of dissent, and no dissent was made), including the Terminal Company, in view of the fact that counsel for plaintiffs stated that he represented the "terminal roads belonging to the Steel Corporation," yet we think this falls short of charging plaintiffs with notice that the propriety of future allowances out of the line haul rate was to be then and there finally determined, and on the theory that the conditions existing when the testimony in the Industrial

Railways Case was taken existed several years later, when the hearing in the reparation case was had.

This seems especially true, in view of the considerations that absorption by the trunk line carriers of the Terminal Company's delivery charges had continued ever since April, 1915, without criticism by the Commission, by way of action upon tariffs or otherwise; that the supplemental report of the Commission in the Industrial Railways Case (following the decision of the Supreme Court in the Tap Line Cases, supra) had materially modified earlier rulings, as was also true of the decision in the Second Industrial Railways Case, supra, and still more especially of the Car-Spotting Charges Case, 34 Interst. Com. Com'n R. 609, where it was held that the line-haul rate covers the customary movement of cars over industry tracks incident to the receipt and delivery of carload freight at convenient points on those tracks for loading or unloading, without regard to the size or complexity of the industry, and that the points at which the cars are to be placed by the carrier for that purpose without additional charge are to be determined by general usage. There is also the further fact that since the decisions mentioned the practice of trunk line companies in the Lorain district to absorb terminal delivery charges of industrial companies seems to have become practically universal, although perhaps largely because such practice was compelled by competitive conditions, and in view of the existing state of law.

These considerations seem to us to emphasize the importance of requiring clear showing that the question of future allowances was, or should have been, understood by plaintiffs to be in issue in the reparation proceeding for the purpose of immediate decision. We are further persuaded to the conclusion that such was not the case by the fact that three members of the Commission dissented from the view of the majority, declaring that "the majority report declares unlawful what we have heretofore found lawful"; that the record in the Industrial Railways Case was before the Commission, at most, only "for the purposes of this case"; that "the majority report imports both record and issues in the Industrial Railways Case into this case, to the practical exclusion of those in the latter"; that "whatever may have been said in 1912, when the record in the Industrial Railways' Case was made, the undisputed sworn evidence in this case * * * affirmatively shows that the claims [for reparation] cover only such transportation service as the trunk lines customarily render elsewhere in the rate district"; and, after referring to the effect of the majority decision, said that "so revolutionary a change should only be required, if within our power, as the result of a clear showing * * * upon a clearly drawn issue. We have here no such showing and no such issue. The parties have not been heard upon it."

But, further than this, it is here affirmatively alleged that the record in the Industrial Railways Case does not correctly show the conditions existing in 1914 and 1915, nor as they now do or hereafter will exist. On the face of the petition, in connection with accompanying affidavits and maps, certain specific facts appear, opposed in greater or less degree to the conclusion of the majority of the Commission as to the

essentially private character of the Terminal Railroad as a mere plant facility of the Tube Company. For example: To the effect that the Terminal Railroad has yards on land owned by it on the south, the east, and the west sides of the Tube Company's property, and apparently outside the plant inclosure; that the Tube Company's property is separated from the Baltimore & Ohio Railroad Company's property on the west by land owned by the Terminal Railroad, and that the Tube Company has no interest in the lands on which the tracks extending eastwardly to the other railroad interchange tracks are located; that the Terminal Railroad has four public team tracks, all outside the plant inclosure, at one of which general freight is received for and delivered to parties in Lorain, and at another of which there is a connection with an electric railroad to which considerable freight is delivered—this track serving also a coal company wholly independent of the Tube Company and the Carnegie Company, and the other two team tracks serving the general public in the easterly section of South Lorain, where neither of the trunk line defendants has team tracks; that the Terminal Company in 1917 served 34 persons, aside from the Tube Company and the Carnegie Company, aggregating 2,023 cars, about 400 of which were delivered on its team tracks; that the iron ore taken from the Black river docks (practically all of which goes to furnaces of the Carnegie Company, none of which are in Lorain) is hauled to the interchange tracks of the trunk line roads over property not belonging to the Tube Company. The situation thus stated differs in some respects from that disclosed in the Industrial Railways Case, and gives some further support to plaintiffs' claim that the Terminal Railroad is not a mere plant facility of the Tube Company.

In these circumstances, we cannot say with confidence that, had plaintiffs understood that the question of future allowances was directly and immediately in issue in the reparation proceeding, and had the facts now asserted been fully presented, with arguments of counsel addressed directly to that issue, the result must have been the same.

The meritorious question before us is of great importance. Since the decision by the Supreme Court of the Tap Line Cases there has been more or less difference of opinion between the members of the Commission respecting the relations between line carriers and proprietary industrial roads. From the supplemental report of the Commission in the first Industrial Railways Case, as well as from the decisions of the Commission in the Second Industrial Railways Case and the Car-Spotting Charges Case, there was dissent by Commissioner Harlan, who wrote the majority opinion in the matter now before us. In this majority opinion, after referring to the fact that conditions relating to industrial roads differ widely in many cases, and that for many years the trunk lines have granted allowances to some, while refusing the same to others, it is very properly said:

"In view of the variance of opinion entertained in the Commission and elsewhere upon the many important and difficult questions so frequently arising out of the relations between the trunk line carriers and industries with industrial railways, it seems desirable that the rulings in this case, which, as before stated, presents conditions that are fairly characteristic, should be re-

viewed by the courts in order that some definite principle may be judicially established by which we may hereafter be guided in such cases as they arise."

In the instant case the majority opinion asserts the existence of a vital distinction between "the spotting of cars on the ordinary * * * spur track or siding and the spotting of cars on the intricate network of tracks beyond the plant interchange tracks" which large industries imperatively require as plant facilities for their industrial operations, emphasizing the proposition that in the instant case the delivery of the cars by the line carrier within the plant inclosure is practically impossible, because by reason of the required distribution between various plants "much of its inter-works service must necessarily be performed with the same power that interchanges cars with the trunk lines and under the same direction or supervision."

The very importance of the questions presented makes their full consideration equally important. Taking into account the entire case, we are of opinion that plaintiffs raise a fair question of the validity of the order complained of, respecting which opportunity should be given for a final decision upon the questions of law and of fact involved. Injunction pending suit should thus not be refused, unless upon balancing the convenience and inconvenience to the one party or the other an injunction appears inexpedient. Pere Marquette R. R. Co. v. Bradford (C. C.) 149 Fed. 492. Upon such balancing, the considerations in favor of injunction seem to us to preponderate. The existing status should be preserved.

Injunction will accordingly issue suspending (and restraining enforcement during the period of this suit, or until further order of the court) so much of the order complained of as relates to future allowances.